# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS -- HARVARD FACULTY CHAPTER, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and MIDDLE EAST STUDIES ASSOCIATION,<br><br>    Plaintiffs,<br>   v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, DONALD J. TRUMP, in his official Capacity as President of the United States, and UNITED STATES OF AMERICA,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.<br>25-10685-WGY |

YOUNG, D.J.                                        January 22, 2026

**ANNOTATED JUDGMENT**

This Court, upon a full hearing and nine-day bench trial,

ECF Nos. 231-248, entry of findings of facts and rulings of law,

American Ass'n of Univ. Professors v. Rubio, 802 F. Supp. 3d 120 (D. Mass. 2025)("AAUP"), and a hearing on the appropriate remedy, ECF Nos. 306, 310, hereby **ORDERS, ADJUDGES, and DECREES:**

### I.    Judgment

Judgment shall enter in favor of the Plaintiffs against the Defendants on Counts I and IV of the Complaint as follows:

### II.   Declaration of Rights

This Court ruled that the Plaintiffs American Association of University Professors ("AAUP") and their associate chapters, and the Middle East Studies Association ("MESA") "have shown by clear and convincing evidence that Secretaries Noem and Rubio have intentionally and in concert implemented Executive Orders in 14161 and 14188 a viewpoint-discriminatory way to chill protected speech" that "violated the First Amendment." AAUP, 802 F. Supp. 3d at 175.  Further, "the Public Officials' threats to continue detaining, deporting, and revoking visas based on political speech serves as circumstantial evidence that such enforcement exists, is viewpoint discriminatory, and has objectively chilled the Plaintiffs' speech." Id.  The "enforcement policy also violates the APA because, for the same reasons, it is contrary to constitutional right.  It is also arbitrary or capricious because it reverses prior policy without reasoned explanation or consideration of reliance interests, and is based on statutes that have never been used in this way."

[2]

Id.  Indeed, "[t]his Court credits the testimony of AAUP and MESA members that the enforcement policy . . . objectively chills their speech."  Id. at 179.  The Court therefore declares, for the reasons set forth in its findings, that that the "enforcement policy" and its implementation: (1) violates the First Amendment right of freedom of speech set out in the Constitution of the United States, and (2) the Administrative Procedure Act.

### III. Order of Vacatur

Pursuant to 5 U.S.C. § 706(2), the Court declares that the Public Officials' enforcement policy and the implementation thereof as set forth in the findings is **OF NO EFFECT, VOID, ILLEGAL, SET ASIDE, AND VACATED.**[1]

### IV.  Sanction

In view of the concerted action of the highest Cabinet Officials of the Executive Branch deliberately to violate the First Amendment right of Free Speech of the Plaintiffs' non-

---

[1] In Trump v. CASA, Inc., the Supreme Court expressly did not decide "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."  145 S. Ct. 2540, 2554 n.10 (2025).  Since CASA, courts have held that vacatur is an available remedy, distinct from injunctive relief.  See Ass'n of Am. Universities v. Dep't of Def., No. CV 25-11740-BEM, 2025 WL 2899765, at *27 (D. Mass. Oct. 10, 2025) (Murphy, J.); Make the Rd. New York v. Noem, No. 25-5320, 2025 WL 3563313, at *17 (D.C. Cir. Nov. 22, 2025) ("When an agency's action is unlawful, vacatur is the normal remedy.") (quoting Bridgeport Hosp. v. Becerra, 108 F.4th 882, 890 (D.C. Cir. 2024)).

citizen members, the Court, pursuant to its broad equitable powers of remediation, imposes the following remedial sanction to protect certain of the Plaintiffs' non-citizen members from any retribution for the free exercise of their constitutional rights.

A.    Any non-citizen member of the plaintiffs AAUP or MESA, who was a member on or after **March 25, 2025** and continued as a member through **September 30, 2025** ("Sanction Plaintiff")[2], shall have a right to institute a proceeding ("Sanction Action") in the United States District Court in which the Sanction Plaintiff resided at the time such Sanction Plaintiff suffered an adverse

---

[2]    Relief is limited pursuant to CASA to these Sanction Plaintiffs as they constitute the group within the plaintiff organizations who both had the courage to stand as part of such organizations' legal action and suffered the constitutional deprivation. See CASA, 145 S. Ct. at 2557.  The actual effect of the Public Officials' unconstitutional misconduct is, of course, much broader.  See Stanford Daily Publishing Corporation v. Rubio, No. 25-CV-06618-NW, 2026 WL 125241, at *3 (N.D. Cal. Jan. 16, 2026) (Wise, J.) (denying motion to dismiss similar claims as those made by non-citizen members in this action); Note, CASA's Complete Relief Paradox, 139 Harv. L. Rev. 646, 668 (2025) ("The nature of the right does not warrant nonparty **relief** even if it allows nonparty benefits); Lincoln Caplan, The Kingmaker?, Havard Magazine, Nov.-Dec. 2025) 21, 29, 70 (quoting Jackson, J. concurring in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 655 (1952) ("With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.  Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.")).

[4]

immigration action changing such Sanction Plaintiff's immigration status from what it was on January 20, 2025.[3]

B.    In such action, the Sanction Plaintiff shall prove by a fair preponderance of the evidence that said Sanction Plaintiff was a member of AAUP or MESA as set forth above in par. IV.A.  Upon such proof, it shall be presumed that the alteration in immigration status is in retribution for the exercise during the course of the present case of their First Amendment rights.

C.    Such proof is conclusive and voids the alteration in immigration status unless the government proves[4] by clear and convincing evidence that:

---

[3]  See Appendix for illustrative potential examples.

[4]  In light of the Defendants' intentional abridgement of Constitutional rights, this Court advises that the government ought not avail itself of the Deliberative Process Privilege as to such alteration of immigration status prior to the commencement of the Sanction Action.  The reason for such advice is that, upon reflection, this Court gave the Defendants far too much latitude in asserting such privilege throughout the course of the trial herein, in derogation of the truth.  The Government Misconduct exception to the Deliberative Process Privilege should thus be presumed.  See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs., 60 F.3d 867, 885 (1st Cir. 1995) ("The [deliberative process] privilege 'is a qualified one,' FTC v. Warner Communications Inc., 742 F.2d 1156, 1161 (9th Cir.1984), and 'is not absolute.' First Eastern Corp. v. Mainwaring, 21 F.3d 465, 468 n. 5 (D.C. Cir. 1994"); Edward J. Imwinkelried, The Government Misconduct Exception to the Deliberative Process Privilege, 65 S.D. L. REV. 76, 90 (2020).

1.   the Sanction Plaintiff's immigration status has expired by its own terms or any expansion thereof;

2.   the Sanction Plaintiff was convicted after September 30, 2025[5] of **any** crime as to which trial by jury was their right under federal or state law; or

3.   there is an **APPROPRIATE** reason under governing immigration law that the Sanction Plaintiff's immigration status should be altered.[6]

D.   Upon the moment of commencement of any Sanction Action by the filing a complaint, the Sanction Plaintiff's removal from the United States is automatically **STAYED** during the pendency of the Sanction Action.   The United States bears the burden

---

[5]  This limitation is necessary to avoid vindictive evasion of this judgment by dredging up some by gone conviction in retribution for participation in the present action.

[6]  "Appropriate" in this context is intended to guarantee, for example, the Sanction Plaintiff's ability to challenge the constitutionality of such governing immigration law. See, e.g., Khalil v. Trump, 786 F. Supp. 3d 871 (D.N.J. 2025), rev'd on other grounds Khalil v. President, No. 25-2162, 2026 WL 111933 (3d Cir. Jan. 15, 2026).  See also Michael Kagan, When Immigrants Speak: The Precarious Status of Non-Citizen Speech Under the First Amendment, 57 B.C. L. Rev. 1237, 1284 (2016); Gregory P. Magarian, Centering Noncitizens' Free Speech, 56 Ga. L. Rev. 1563, 1590 (2022); Katherine Shaw, Beyond the Bully Pulpit: Presidential Speech in the Courts, 96 Tex. L. Rev. 71, 138 (2017)("[W]here the conduct in question is executive action, statements by executive branch officials supply the most relevant evidence of intent"); Note, Protecting Noncitizens Liberty When the Executive Seeks to Punish, 139 Harv. L. Rev. 799 (2026).

[6]

affirmatively to ascertain and determine whether such person has filed a Sanction Action in the United States District Courts.[7]

E.    The Court recommends that an advisory jury be empaneled to assist the court in deciding factual issues.[8]

### V.    Jurisdiction

The Court retains jurisdiction to enforce or modify this Annotated Judgment.  The Court shall not retain jurisdiction over any Sanction Action, should any there be, which shall be subject to the jurisdiction of the appropriate United States District Judge presiding in such Sanction Action.

**SO ORDERED.**

---

[7]  The reason for this burden-shift is to prevent the apparent present practice of whisking non-citizens out of the district to avoid jurisdiction.  The burden is minimal: all the United States need do is check the Sanction Plaintiff's name on PACER in the district of residence to determine whether a Sanction Action has been filed.

This stay is akin to those temporary stays presently in effect in many district courts.  See, e.g., United States v. Russell, 797 F. Supp. 3d 552 (D. Md. 2025).  It in no way derogates from the precedential effect of Khalil v. President, No. 25-2162, 2026 WL 111933 (3d Cir. Jan. 15, 2026) within the Third Circuit, as it has no bearing on administrative immigration proceedings.

[8]  The moral effect of a jury verdict cannot be overstated. The American Jury is the most robust and vital expression of direct democracy extent in the world today.  The people's participation in this act of government is long overdue.

[7]

> Freedom is a fragile thing and it's
> never more than one generation
> away from extinction.  It is not
> ours by way of inheritance; it must
> be fought for and defended
> in every generation, for it comes
> only once to a people.[9]

President Ronald Reagan, Inaugural Address as Governor of the

State of California (January 5, 1967).

_William G. Young_
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[10]

---

[9]  https://www.reaganlibrary.gov/archives/speech/january-5-1967-inaugural-address-public-ceremony.

[10] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[8]

## APPENDIX

I have two hypotheticals here.  And you'll understand now these are hypotheticals.  I am going to make reference to real-life events, but they are not of record in this case, and I personally don't know and I'm expressing no opinion on any of that.

[L]et's say people resident in the United States, noncitizens from Venezuela, have temporary protected status. And I don't know that.  But let's say the President were to revoke that temporary protected status.  And that one of these Venezuelans is a member of -- because they're a teaching assistant or a graduate student, they're a member of the American Association of University Professors, within the appropriate time period, and she says, "Wait a minute, I'm in this class, you can't revoke it."  And then the government -- and neither of the other two [exemptions] apply, her visa is perfectly valid, she hasn't been convicted of  any crime, and . . .  the government says, "No, come on,  that's ridiculous."

Now Venezuela has nothing to do with the events that gave rise to this lawsuit . . . But the government's got to prove it [i.e. that the Presidential action in no way constituted retribution].  And that's part of the sanction.

[9]

Let me give you another situation closer to our case or I think harder for the government to prove.

I read somewhere . . . in the wake of the tragic and horrific assassination of Charlie Kirk, that because certain noncitizens said something about that event, the Department of State had something to say about their visas.  And I remembered, when I saw that, I said, "Well that's our case."

So what are they doing?  If it's just speech -- it may be repulsive speech or disgusting speech, but if it's just speech. Well the Department of State can't do that.  And again this is a hypothetical.  [B]ut let's say that happened, we'll assume that happened.  And then the person comes in and says, "I'm a member of this class, you can't do that to me."

Well again, the government's going to have to prove that their reason was not in fact in retribution . . . and in addition, my second, that it's an appropriate exercise of governmental power.

AAUP v. Rubio, No. 25-10685 WGY (D. Mass. January 15, 2026), Transcript of hearing on remedy 17-19, ECF No. 310.