# Exhibit B

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

*********

For Hearing Before:
Judge William G. Young

Motion to Stay

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, February 26, 2026

*******

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

APPEARANCES


RAMYA KRISHNAN, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


PAUL F. STONE, ESQ.
LINDSAY M. MURPHY, ESQ.
ETHAN B. KANTER, ESQ.
VICTORIA M. SANTORA, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
    For Defendants

P R O C E E D I N G S

(Begins, 2:00 p.m.)

THE CLERK: The Court will hear Civil Action Number 25-10685, the American Association of University Professors, et al vs. Rubio, et al.

THE COURT: Good afternoon counsel. I'll start by saying that I've authorized internet access to this hearing as I have in the past, and so it's appropriate to say, if you are accessing this hearing via the internet, you must keep your microphone muted. If you fail to keep your microphone muted, I'll have no choice but to cut you off from the hearing. It is of course a public hearing and you are welcome.

Remember however, that the rules of court remain in full force and effect, and that is to say there's no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

With that done, counsel have afforded me a list of all the counsel that's present, and I'm grateful for that. I think the efficient way to proceed is, if you're going to speak, introduce yourself at that time and, um, so that I have a full and accurate record.

Let me tell you why -- well let me tell you what I'm going to ask, because I don't know that this is going to be a lengthy hearing at all, and then I'll back

up and tell you procedurally why I've decided to proceed as I have.

First, I want Mr. Kanter really, representing the public officials, to tell me what the urgency for this stay is? That will be my first question. Then I want the plaintiffs to tell me why they don't care about the stay here? And then lastly, back to Mr. Kanter, or -- and I understand you have people with you and I'll hear from any one of them, I simply have some questions about, um, the position that you have taken here, and I will explain each one of those each as we go.

You should understand why I'm -- I've called this hearing in open court here. I didn't call you together so I could pontificate about matters already decided, and indeed no one requests that, and I respect that. At the same time, having read the, um, public official's brief in request for a stay, it's fair to say I find that brief both thoughtful and, um -- it's not like I haven't thought about these issues, but it's a lawyer-like and, um, careful approach to these issues.

The reason I'm holding this hearing -- and again I speak just to be transparent, is that it appears that the, um -- the procedural or the advocacy value to seeking a stay of proceedings has changed. This is a civil case and, um, over the years I've had motions for

stay before and I had, in the past, treated them much like motions for reconsideration, though filed after the notice of appeal, so that my, um, jurisdiction is considerably more limited. And I will tell you that, in the past, this is the first hearing I've ever had on a motion to stay.

But when I say the procedure is different, it appears -- and I express no opinion on this, I just observe it. It appears that the administration has, um, believes in the efficacy of motions to stay as a vehicle for moving issues as rapidly as possible to the Supreme Court. I've had only one experience with it and that was in the National Institutes of Health case, the -- I rendered there, after a full trial, I rendered an opinion, and I -- a full written opinion, and there was a motion to stay on the grounds of the Court had no jurisdiction. Here the motion to stay is more limited, as I understand it, it is that I don't have jurisdiction to do the sanction that I have decreed.

So in that case, following my usual procedure, I did write something, I wrote about 3 pages, and it was up to the Court of Appeals. The Court of Appeals wrote 33 pages siding with me. Then it was up to the Supreme Court. I've never seen that in my years of practice. And the Supreme Court both affirmed and reversed me, it

affirmed in part and reversed in part.

If that's going to happen, and I'm not asking that, um, I consider it my duty -- and I'm taking the opportunity, um, in light of a thoughtful brief, to, um, write my reasons for -- and I come on the bench thinking that the motion must be largely denied, though there are a few things we should talk about, um, I'm going to spell out why. But against that is my duty, if the public officials have a legitimate reason for urgency here, for me to, um, move as rapidly as I can to enter my decision on the motion to stay. Now I'm not sitting on it just to have, um, time pass, that would be improper and I don't consider it.

So, Mr. Kanter, there's my first question, or anyone on the defense team, what is the urgency of ruling on the motion for partial stay? Which I do treat with respect and I want to say that to all counsel, everyone's played it straight with the Court in this case, and I've been quick to say that. I don't see what the urgency is? No one's done anything under the sanctions provision. Nothing has happened. Indeed it used to be, and I'll apply it here, a presumption of regularity, um, until I have some suggestion to the contrary.

I'm presuming, and I say this in utmost good

faith, that, um, the Secretary of State and the Secretary of the Department of Homeland Security, having had the law declared, while they have every right to appeal, are conforming their conduct to the law. I have no basis to suggest otherwise. And of course no one who is a member of -- or was a member in the requisite time period of either of the associations, has invoked any of the procedures set forth in the government -- in the Court's sanction provision.

So what's the urgency here? I'll hear you, sir.

MR. STONE: Thank you, your Honor. Good afternoon, my name is Paul Stone, and I will be speaking for the defendants today.

THE COURT: Mr. Stone, of course, and you may, and I appreciate your being here and thank you.

MR. STONE: Thank you. And Mr. Kanter is with me.

THE COURT: No, I understand. He's welcome. He made the phone calls prior to the hearing. But, Mr. Stone, you are welcome. And I'm privileged -- and I say this to plaintiff's counsel as well, with the level of advocacy I've had throughout this proceeding, and so I welcome -- well I want to know, what's the urgency here, the real urgency?

MR. STONE: Thank you, your Honor.

THE COURT: One would think we would wait until

someone invoked something here and said, "I'm entitled to the procedures that this case sets out." It hasn't happened.

MR. STONE: Well thank you, your Honor. As far as we know, nobody has filed one of these suits. However there is an immediate burden on the government because -- the order places a burden on the government to keep track of who's filed these cases.

THE COURT: Well I -- I interrupt, and forgive me for that, but not until you're at the point at the end of the immigration decisions where you're going to, um, deport a person and then you're right, there is the burden on the Department to check -- well it would seem that's a minuscule burden.

MR. STONE: The problem, your Honor, is it's not limited -- while we believe the Court was correct in limiting it to the parties, um, the burden to check, because the government doesn't know who, um, the ailing members of the plaintiffs are, the burden is -- applies across the board. So if the government places someone in removal proceedings who could conceivably have been a member or, um, even not, the government's got to be checking in all of those cases, which is a much greater burden than it would be to just --

THE COURT: Why don't you just ask them? You

would think that anyone who, um, thought they had a benefit and didn't want to be deported, would at least tell you.

MR. STONE: One would think that they would have the burden to inform us for that reason, because they're --

THE COURT: Well, no, you read the -- you read the decision correctly, but now I'm suggesting the decision talked about the PACER, that's hardly much of a burden. You pick someone up where they reside. In my remedial, um, decision, that's the place, that's the District Court. You see I was trying so hard not to interfere with the operations of, um, Immigration. I understand what the statutes are and it's only at the end that I, um, have required -- yes, I've required the agency to check.

Now you say that's an impossible burden?

MR. STONE: The standard isn't for an impossible burden, but it is a heavy burden on the government in every case to have to go checking as to how to get another layer of procedures on top of the normal procedures for determining --

THE COURT: Well for instance -- and I don't import any of this jurisprudence into this case, but a sore spot in this area -- and I will speak only for

myself and, um, cases that I know about. Many judges, I mean a large number of judges, um, when a habeas corpus decision is filed by someone who claims improper detention, is filed, surely the courts -- I know of no decision that goes to the contrary, have the right to enter stay orders to sort out whether in fact the constitutional rights that the detainee is asserting are cognizable in the District Court, and that's where we get into this "Who entered the stay order first" and the like.

Isn't there a protocol now to check?

MR. STONE: Your Honor --

THE COURT: It has nothing to do with this case. Don't you check before you deport someone whether there's a habeas petition out there?

MR. STONE: Generally if there's a habeas petition, then ICE and the person who has custody over the alien are party to that case, so they know right away what is happening in that case. But so in that case they don't have the burden to find out, they generally just do through the normal judgment process. The problem here is the burden has now been put on the government in pursuing its removal proceedings, um, in which it's a different situation.

THE COURT: I'm interested in the answer. There

is no protocol, within the Department of Homeland Security, when you're about to deport someone, valid orders to deport them and the like through the Immigration proceeding, to check that there's no proceeding where the person is detained?  You don't do that?

MR. STONE:  There are procedures.  I don't litigate those cases, so I'm not as familiar with them, but I can tell you that when someone is going to be removed, there's a notation if they, for example, have a petition for review pending, um, presumably.  Again I don't litigate these cases, but I imagine there would be a notation that there's a habeas case pending or something of that order.

THE COURT:  Well that's what I would expect, and so there's no additional burden.  It's a keystroke.

MR. STONE:  Right.  But, your Honor, one of the other issues is, um -- we're not talking about, you know at the end making a decision, the order actually says, "Once an adverse Immigration action is taken," which it sounds like a notice to appear in removal proceedings, for example.  But it's also -- the decision is also extraordinarily broad in that it could encompass decisions by USCIS, which isn't even a party to this case.  But USCIS --

THE COURT: Well that was something I was going to ask you about.

This -- (1) it's in the same secretariat. (2) we are now living -- at least the governmental theory of Article II anyway, is this unitary government, it's all one, and the President is at its head, and everyone must follow what the President decides.

Are you saying that it's acceptable that, um -- you have the proper name, I think, this is "CIS"?

MR. STONE: "USCIS."

THE COURT: Yes, the "USCIS," doesn't know what -- for instance, I don't know who is responsible for the custody, but I assume it's ICE, but that the one doesn't know what the other is doing?

MR. STONE: Well they do different things.

THE COURT: I agree with you.

MR. STONE: ICE handles removal proceedings and then does handle custody and then actual removal. CIS handles affirmative applications which take place outside of removal proceedings. So, for example, if someone may apply for relief -- you mentioned TPS in your example, they will apply for TPS relief to the USCIS. USCIS also handles the revocation of TPS. So that decision may be entirely within that agency. The other example that you used was that the President

denies TPS all together, which is a different situation.

THE COURT: I'm not -- I accept exactly what you said, I think that's probably -- I really do respect what you're saying.

So these things happen, within the executive, in the appropriate agency. All this decision says is that before you deport someone, you check to see if they have -- if they claim to be a claimant pursuant to this decision. It hasn't happened yet, and months have gone by.

I can think of lots of reasons why a -- someone who is a claimant, as the decision defines "claimant," um, wouldn't bring such an action. The reason -- an obvious reason being if en masse a large group -- like the Haitians before Judge Reyes, that group makes claims that revocation of Temporary Protective Status was improper, and she so held. But that doesn't mean that a claimant who is "protected," if you will, by this case has a viable case that the reason the executive did what it did, even though it did it improperly, was in retribution, which is my concern here. This is a free speech case. To me it's only incidental that it takes place in the -- in the Immigration arena. It's fundamentally a free speech case.

But that's your problem, is this -- this

affirmative burden. And it is an affirmative burden, a "sanction," if you will, for violating these people's civil rights, their constitutional rights.

Is there any other reason for urgency?

MR. STONE: Yes, there's a few reasons.

THE COURT: Please.

MR. STONE: The second reason is that by setting up this parallel proceeding in the federal courts, what ends up happening is it undermines the Congressional purpose in streamlining removal proceedings. So now we have two different proceedings where the government has to prove largely the same thing, because they have to prove deportability under removal proceedings, and now they have to come into federal court and prove that they're removal in federal court, which then --

THE COURT: You don't have to prove it. I mean, with all respect, this doesn't challenge the removal, or at least the orders, it causes the government to prove, by clear and convincing evidence, that the removal proceeding was not in retribution for the person's exercise of their First Amendment rights. That has nothing to do with the grounds in the Immigration proceeding of whether the person is lawfully or can lawfully remain in the United States. It only protects the person from removal, because they have exercised

First Amendment rights.

And it places the burden on the government -- yes, it does, it places the burden on these officials to prove that, by clear and convincing evidence. And of course you know why it does, it does that because they intentionally sought to -- and successfully did chill those individuals' First Amendment rights. That's all. I'm not saying anything about removal proceedings.

MR. STONE: Well, your Honor, as I recall the order also says that there needs to be an independent ground for the person to be removed.

THE COURT: And the removal -- for instance, the lawful removal of Temporary Protective Status would be such a ground, the expiration of one's visa would be such a ground.

MR. STONE: Exactly, and I understand the idea and the purpose behind having this parallel proceeding, but it still has the effect of creating additional hurdles for the government undermining the Congressional purpose of streamlining these removal proceedings.

THE COURT: Well that's the sanction, because these two Secretaries, and those in league with them, have intentionally chilled the free speech of individuals, discrete individuals who had every right so to speak. And I imagine the, um, appeal will consider

whether -- on the findings of fact that this Court has made, I could enter such an order. And I -- I fully respect that on appeal. But to say that I am setting up a "parallel proceeding," well -- all right, I -- I really don't mean to, um -- I want to know what it is, and you're telling me.

Other than the points you have raised, is there any other urgency in mind here?

MR. STONE: Um, well those are pretty significant concerns.

THE COURT: I didn't -- I'm not -- believe me I'm not.

MR. STONE: I would add, in the balance of harms, you've pointed out the government hasn't filed one of these suits yet. But that also goes the other way, which is that the plaintiffs haven't shown that they are going to be significantly harmed by staying this, and in fact they have not opposed staying at least Part 4 of the decision.

THE COURT: They have not. I mean to ask them that.

MR. STONE: That is --

THE COURT: What are you -- I guess I don't understand -- well, yes, I do understand. I'm sorry.

MR. STONE: And I guess the one other thing I want

to add is that we are moving to stay Part 4 of the decision, um, we ask for a partial stay, um, and Parts 2 and 3, we don't view those as being coercive relief, the APA and declaratory relief. However, we would move to stay those to the extent they could be interpreted as providing coercive relief, essentially.

THE COURT: Thank you. Thank you. All right, let me ask the plaintiffs then.

Why don't you care about this? And I don't know to whom to ask. I'll need your last name?

MR. JAFFER: Your Honor, I'm Jameel Jaffer.

THE COURT: Are you going to speak to it?

MR. JAFFER: I am not, I'm standing up only to introduce myself and to say that, with the Court's leave, my colleague, Ramya Krishnan, will represent us today. She's on zoom.

THE COURT: And she may, and she's of course welcome.

But your name again, sir?

MR. JAFFER: Jameel Jaffer.

THE COURT: And, Mr. Jaffer, thank you.

Ms. Krishnan, I'll hear you.

What if they started to do what I found they had done -- I'm presuming they're not doing it now, but what protection do you have if we take away this Section 4?

MS. KRISHNAN: Um, thank you, your Honor. If I could just start by addressing two quick things, which is that I want to start by reiterating something we said in our response to the motion, which is that we don't think a stay of any of the relief that this Court ordered is warranted, and certainly they haven't shown irreparable harm. I'm happy to address the reasons we don't oppose the stay in particular, but something that, um, Mr. Stone said at the end there just gave me pause.

Which is, you know, to the extent -- we had always understood their partial stay motion to seek only a stay of the sanction, I'm not quite sure what Mr. Stone meant when he said --

THE COURT: I interrupt, I'm sorry, and I fully understand and respect why you're here on the internet, but forgive me when I interrupt you, which is my practice. It's a lot easier if we were together in the courtroom. I don't mean in any way to be rude, but we're not going to reargue this case. I understood it was a partial stay, only a partial stay, and my question is why don't you care about the partial stay? Not the rest of it, you've made that clear.

And the thing that I'm most likely to tweak -- I'm always trying to be honest, is, um, the remedial portion, this Section 4, and respecting the defendant, I

didn't ask them here to tease them about things the Court has already decided. I take responsibility for what I do. But candidly I thought the remedial portion was -- and I think I used these terms when we're talking remedy, about the best I could do for you, do for your client, as I've defined the ones who can claim relief. Now I respect your cross-appeal and I imagine that you will be claiming I could and should and must indeed do more, but that's not for today.

Why didn't you care about what I did do?

MS. KRISHNAN: Well it's certainly not that we don't care, here was our calculus. Your Honor mentioned one of your, um -- well there's three reasons.

Your Honor mentioned one of your other cases going up to the Supreme Court on a stay application, and we worry candidly, given the concerns the government has raised about the sanction remedy, that the government is likely to take this matter up, in an emergency posture, potentially all the way to the Supreme Court, and that the important questions that are at the heart of this case that your Honor has recognized as being important may be denied the careful and deliberative attention that they deserve. And so that's one reason.

The second reason is that, unlike the other remedies your Honor issued, namely the declaration of

rights and the APA vacatur, our view is that the sanction is unlikely to address the chill on plaintiff members in the immediate term. And that's because, unlike those other remedies, the sanction offers only after-the-fact relief that kicks in only after a member has suffered some adverse Immigration enforcement action. And the problem is, as we explained in our notice to the proposed judgment, when it was a proposed judgment, is the relief comes too late. And so while as members fear being arrested and detained based on their speech, they will be chilled even if they know it is a near certainty that that arrest or detention will ultimately be held unlawful.

The third reason, and this is the final reason, is that the government's objections to the enforceability of the sanction action compounds this concern because they give rise to uncertainty about the immediate availability of the relief. The government has already previewed, including at this hearing, the volume of arguments it plans to raise once a sanction action is filed. They include that the INA strips the District Court of jurisdiction to hear the case, that the INA would bar any automatic stay of the sanctioned plaintiff's removal, and that this Court doesn't have the authority to bind the actions of other courts. And

we certainly don't agree with those arguments, but even if they were ultimately resolved in the sanctioned plaintiff's favor, those individuals could potentially be in prison for months or worse while those arguments play out, and of course those arguments could be resolved against them. So it's certainly not the --

THE COURT: Let me ask you this, and excuse me again for interrupting.

As to your first reason, those are procedural, tactical maneuvers that litigants lawfully may take. I have nothing to say about that. And I stay away from normative judgments about a procedure that is lawful and provided for by the rules. Litigants should do what best benefits them. My problem, and it was my problem at the remedial hearing, the fact that it doesn't immediately kick in -- and I understand what you're saying and I understand the legitimacy of their concerns, and of course maybe that's why we haven't heard anyone claim some relief under the procedure that I have ordered, because they may fear becoming increasingly likely a target or something. How then do I deal with the antiinjunction procedures of Congress?

I -- this is not an injunction. I know the public officials are going to claim that it is, but I don't view it as an injunction at all. I haven't ordered --

I've set out a procedure, a procedure that can be claimed, and then I've set out who has to do what. But, um, I guess I don't look at that -- the injunction that you want, I thought I'd made it clear, I don't think I can give it to you under the applicable statutes.

MS. KRISHNAN: We -- I mean we think that the injunctive relief we sought is not barred by 1252(f)(1), and I'm happy to sort of explain why. But just on the question of our nonopposition of the sanction, um, it really is candidly the combination of our belief that it is in our clients' interest, for these highly-consequential issues, that your Honor has recognized as highly-consequential, to go up to the First Circuit, and if necessary the Supreme Court, in a considered and a deliberative fashion, not in a rushed-stay posture, and that that fact, combined with our view that the sanction doesn't -- won't alleviate the chill on plaintiffs' members in the near term, in part because of all of the government's objections to the enforceability of the sanction actions, arguments that they're likely to raise as soon as any such action is filed, that they weigh -- that they weighed in our decision not to oppose a stay of the sanction.

But as I said at the outset, it's not that we believe a stay of -- a stay of the sanction and

certainly not of the declaration that APA relief are warranted, but those are the considerations that played into our decision here.

THE COURT:  Thank you.  As throughout, I -- and I'll express it again to you, I appreciate your candor, you have directly answered the Court's questions.

I want to do only one other thing this afternoon, and I'll turn back to the government, though I will call on the plaintiffs once I've heard further from the government, if they wish to be heard from.

Again I've said the government's brief, the public officials' brief is thorough and thoughtful, and I believe that, but since I have you here, I have some questions about it, and I want you to understand I'm diffident in putting these questions.  The normal situation the Court has not expressed a view and, um, this is not the normal situation.  I mean I have expressed a view.  I've tried to be thoughtful and I've tried to be thorough and I've tried to listen.

So, um, I do want to ask my questions.  But if you want to tell me that you simply want to stand on your brief, that's fine, and I treat that with complete respect.  I didn't -- I'm not going to argue.  About urgency, I felt it appropriate for me to push back, but on the questions I put now, which I'm going to have to

further address in my opinion on the stay, I'm just asking questions. So, um, if you'd rather not answer them beyond the written brief in this forum, that's fine. I'm not getting into an argument where really pretty much my cards are open on the table, I'm just seeking help here if there's something more to be said.

Mr. Stone, do you understand what I'm grappling with here?

MR. STONE: Yes, your Honor, we're here to help and happy to answer any questions the Court has.

THE COURT: And I appreciate that.

So again, I very much recognize that I am bound by the, um, decisional law of the First Circuit and this, um, *Aguilar* decision is a decision that must be dealt with, um, you must face up to it, as must I, and I'm going to frame all of this as questions.

I remember this raid. The District Court judge had of course been a colleague and remains a colleague of mine, though we have not discussed this case in any way, shape, or form. But the decision in the District Court, which the First Circuit affirmed, is, um, one made by a trusted colleague. Moreover, I work for the First Circuit and, um, throughout his service on that circuit, I have known personally Judge Selya, he is a consummate wordsmith and what he says he means.

And having said that now, I view that the -- the *Aguilar* decision is a channeling-type decision, it's an exhaustion-of-administrative-remedies-type decision, "Don't interfere with that at all."  And it's not that suddenly in your brief I'm aware of the *Aguilar* decision, I was aware of it through the course of the trial.  What's wrong with that interpretation?  I don't think I interfere.  I come in only at the end where a claim is made, and Ms. Krishnan tells me, in poignant detail, why maybe claims would not be made.  But I'm talking law now.

Isn't *Aguilar* a channeling decision if it channels these deportation determinations into the administrative agency and, um, requires that to be exhausted before a court, this Court can, um, step in, if at all?

MR. STONE:  It -- yeah, 1252(b)(9), also called the "Zipper Clause," it does require that removal proceedings take place, and that they be completed, and then those are what are actually reviewed in the Courts of Appeals.  So I think that characterization is correct, your Honor.

THE COURT:  But -- and you are right that the deportation decision, under the Real ID Act, is in the jurisdiction of the Court of Appeals, not this court, but I guess I persist in thinking that this court has a

role, and throughout our history has had a role, in protecting constitutional rights. So my effort to do that comes in at the appropriate time. I'm not ousted from jurisdiction to protect constitutional rights, I wouldn't think. I want to ask questions.

That -- it would be the factual distinctions here that would allow me to go forward in *Aguilar.* What's wrong with that? I guess that's the best way of saying it.

MR. STONE: Your Honor, I don't want to say that we're not trying to get you to reconsider your decision or deny what you found, we're just moving for a stay because we believe we have a likelihood -- a likelihood of success on the merits.

So focused on what your Honor ordered in the relief, the reason, um, 1252(b)(9), and we have it highlighted, would have succeeded on their argument, that that bars it, is because it does come, the procedure does come early. If the government issues a notice to appear in removal proceedings to an alien, that has to be heard in a removal proceeding, and it can't also be under a -- it can also be heard in District Court even for a different issue, because that involves the, you know, the initiation, the execution of removal proceedings that are included in this Zipper

clause.

THE COURT: So it would -- let me see if I understand. What offends the public officials here, whom you represent, is that a claimant, under this Court's order, could immediately, in an appropriate District Court, once there's a potential change in their immigration status, could make a claim in the federal court and, um, that proceeding would be initiated, and you would say at best that can't be done until after the immigration proceedings have reached an end, is that what you're saying?

MR. STONE: That's correct, your Honor. But even then it would need to go to the Courts of Appeals because --

THE COURT: Because all that's left is deport or not deport?

MR. STONE: Right, but there are a number of issues that can be included in that, the *Khalil* decision in the Third Circuit explores that, that constitutional claims can be considered. The Court talked about the use of the Hobbes Act that could potentially be used for, um, gathering additional evidence, if there is a sufficient, the record isn't sufficient to examine, for example, the First Amendment violation, which is what was at issue in *Khalil*. So our position is that

1252(b)(9) means that that -- the review of that has to come at the end.

And the logic behind that is similar to what the Supreme Court talked about in **American Arab** where it essentially said that, yes, their, you know, First Amendment violations can be reviewed in removal proceedings, but they have to wait until the removal proceedings, even though there may be some chilling in the meantime. That's when the -- that's when Congress said that reviews happens. And that's similar to the way we review 1252(b)(9).

THE COURT: Thank you. I appreciate your answer. Another question.

Now the antiinjunction requirements of the law. I issued no injunction here. They claim that I should have and it would be appropriate, but there's no injunction here.

MR. STONE: I think your Honor already anticipated our answer, which is that this has -- while it's not labeled an "injunction," this does have the effect of an injunction, it requires the government to do certain things, it requires the government to prove certain things, those all sound in a mandatory injunction.

THE COURT: I guess -- I don't mean to push back, but it's the same thing when you say you've created a

new use of action, and to me the proper analog is not an injunction, but it's like after a trial. This is after a trial, there is a remedial order that imposes certain procedural requirements. And those requirements have costs, true. You say that's forbidden under the antiinjunction privileges?

MR. STONE: Well what's forbidden is, um, ordering the government to, um -- to take an affirmative action or, you know, act as an injunction, um, which is different. For example, there's cases about, um, rights to, um, hearings on release, um, for people who are detained, right, rights to bond hearings, and those cases had declaratory judgments talking about, you know, the burden in bond hearings. That's different than what's happening here. This isn't just setting up, you know, a burden, for example, for the government to meet, it's requiring the government to appear in a whole different judicial proceeding to respond, to produce additional proof. Ideally it would be --

THE COURT: It is. It is. It's a sanction for the proven violation of the claimant's constitutional rights. We've already decided that. Assuming that that is or has been properly decided, then that's a burden that the public officials are going to have to bear. It's not an injunction.

I think I understand your argument. Let's talk just a moment or I'll ask a question about 1252(g), and I appreciate your answers. I -- I read 1252(g) as forbidding -- forbidding the, um, federal courts from, um, to these actions, to commence proceedings, adjudicate cases, and execute removal orders.

As to the first two, I've spoken to neither of the first two at all. I may commence proceedings. That's precisely what Ms. Krishnan is worried about, that you may commence proceedings, the officials may commence proceedings, Secretary Noem and her agency may commence proceedings, deprive people of their liberty, may adjudicate these proceedings, without me saying a word, or any District Court saying a word. And then the stay, the stay comes in, if you're going to execute removal orders, yes, that's how it works, and that's the sanction for her violation and Secretary Rubio's violation of constitutional rights. But I'm not interfering with the operation of the agency, it's just a stay, um, until these added requirements -- I'm listening to what you say, but until these added requirements are satisfied.

But I don't see it -- it's more complex, but I don't see it as any different than the stay I entered when someone -- because I know nothing of the facts,

that when I enter a stay, "Don't move them out of this jurisdiction," because of the jurisdiction requirements, "until I've had a chance to look at these papers." Uniformly that's upheld. And yet that prevents ICE from, um -- and it's unlawfully so. Nothing -- I know of no decision that says that such a stay order is improper.

MR. STONE: Well it's not just the stay, your Honor, entering the stay of removal, it does interfere with the commencement and adjudication of proceedings, because there is this parallel proceeding where the judge could decide, "No, you don't get to go forward with removal proceedings," and that certainly does interfere with the commencement and adjudication of removal proceedings. So it's not just the stay.

THE COURT: Again, that's the point that you've made. That one of the things that concerns you is that the claimant, um, gets a -- is picked up, we'll say, he's picked up, and immediately he of course says -- it hasn't been adjudicated what their status is, they say, "I'm on a valid Visa," and the government, or Homeland Security says, "No, your Visa's been rescinded." All right, well there's a factual issue. And your point -- and I'm listening to that, is that the claimant says, in an appropriate District Court, "Wait a minute, I'm the

claimant in AAUP and they're doing this because of my free speech." And, um, one imagines then a judge, reading my decision, and we'll hope persuaded by my decision, might do something.

Am I correct? Might do something right then?

MR. STONE: Yeah, I think that's the procedure you've laid out in your order, sir.

THE COURT: Thank you. Oh, I understand that. I understand that that is a concern.

Let's see if I have any other questions?

(Pause.)

THE COURT: You talk about the effect on nonparties. We've talked about that. I -- I sort of see and treat Article II really now, as I think the President has declared, as a unitary body. It doesn't go that, "Well you haven't got CIS before me." No, I don't. But I've got two cabinet Secretaries who have violated constitutional rights. Who supervised -- in the case of Secretary Noem, who administratively supervised the agency that you say is a nonparty. It seems to me, um, that I'm not terribly troubled that they aren't parties here, though they may have some obligation.

What's wrong with that analysis?

MR. STONE: Your Honor, looking into what was --

what took place during the trial, there was a great deal of analysis of the facts of what happened when aliens were referred for Visa revocations, or being placed in removal proceedings, that was looked at very closely by the Court, and the reasons for that, and I understand the Court's findings on those reasons, but that there was no factual litigation about what USCIS does, for example. Them being included in this is, um -- and for the first time. So we don't think that that's appropriate.

THE COURT: Thank you, Mr. Stone, but I think the factual record doesn't bear that out.

All right, I think those are the questions I wish to ask. I will -- this is not the argument, I just wanted to know what he had to say, Ms. Krishnan, and he told me and it's helpful. Now one part of it resonates. So while I have you here, at least virtually, and I wish you well, um, he's troubled by parallel proceedings. Well of course that's exactly what you want.

You want, if they come after one of your clients -- or your clients are the association, but the proper "claimant," as I've used the word here in this session, you want to go to the appropriate -- I know you want more, but under what I've already decreed, they go to the appropriate District judge, and let's say it's a

judge who fully agrees with the analysis of this Court, and it being a final judgment, is prepared to, um, uphold that final judgment, and so the claimant, perhaps represented by you, is going to say, "Well stop that, Judge, I mean the person is in prison right now and it will take months for them to adjudicate it before these administrative judges."  And, um, only then -- and that's how we get around *Aguilar*, you say, or I say maybe it's a channeling provision, that the relief has to be now.

So how could a Court give that in light of the array of, um, statutory restrictions on this Court -- this Court, the District Court, by Congress?  Very clearly Congress has expressed its view on these matters.

MS. KRISHNAN:  Um, well, you know Mr. Stone has mentioned the Third Circuit's recent decision in the *Khalil* case.  I would note that there are several other decisions concerning the, um, other students that weren't the subject of our case, that, um, have resulted in their habeas proceedings and decisions finding that 1252(b)(9) does not properly apply.  And (b)(9) goes to the Court's jurisdiction, it isn't about relief, and this Court correctly found that it had jurisdiction to hear our claims challenging a policy, um, because they

rose out of the policy that the administration has engaged in, not from any of the, you know, three actions mentioned in 1252(g). And for the purposes of (b)(9), our claims are independent of and collateral to the removal process, which is the standard the First Circuit applied in *Aguilar.*

But I also note, and your Honor has recognized this at several points, that, you know, what we believe is required in this case is, um, injunctive relief, and the injunctive relief we've sought, against the policy, against certain enforcement actions like Visa revocation, that are clearly not covered by 1252(f)(1), would not raise any of these concerns, um, relating to (b)(9), that the government is raising with respect to the sanction.

THE COURT: Thank you. Thank you.

I think that covers the ground that I needed to cover, my obligation is to rule on the motion for a partial stay. My ruling will be accompanied by a written decision and, um, I will make it as expeditiously as I can.

Before recessing, I -- and I'll start with the plaintiff this time, are there any questions that the Court's proceeding today has raised that you'd like to address?

(Pause.)

MS. KRISHNAN:  No, your Honor.

THE COURT:  Mr. Stone, any questions that my proceeding has raised?

MR. STONE:  No, your Honor.

THE COURT:  Then this proceeding is at an end. I'm prepared to, um, go to the next cases which will, um, these are initial case-management conferences, and I will get through those conferences very quickly.  And I say this -- our proceeding is at an end and you're all excused, but you're welcome to stay, because when I'm done, having recognized the students from the Boston University School of Law, I'm simply off the record, I'm going to take off the robe, and we will discuss practice and procedure.  We will not discuss your case, off the record, nor will we discuss any of the case-management cases.

And I say to the lawyers that they're welcome to stay, but if you could spare the time, I may put to you the question of how proceedings in this session of the court are the same as or different than proceedings in the other courts where you practice?  Because not all of you spend your time primarily in the District of Massachusetts.  You will not give this Court any compliments at all, it's the comparison that is helpful

to the students. So no one is required to stay, nothing turns on it, but that's what I'm going to do. And I make that offer.

All right. We're -- you people are excused. Honestly I don't need counsel table for this, we'll -- and for the call of the 16.1 list, counsel will understand that I do not need the Court Reporter, so he is likewise excused.

(Ends, 3:00 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, February 26, 2026, to the best of my skill and ability.

/s/ Richard H. Romanow 03-02-26
_____
RICHARD H. ROMANOW   Date