**Nos. 26-1141 & 26-1195**

# In the United States Court of Appeals for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, *ET AL.*,

*Plaintiffs–Appellees,*

v.

MARCO RUBIO,
IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, *ET AL.*,

*Defendants–Appellants.*

*On Appeal from the U.S. District Court
for the District of Massachusetts
Docket Number 1:25-cv-10685-WGY*

## DEFENDANTS–APPELLANTS' PRINCIPAL BRIEF

BRETT A. SHUMATE
 *Assistant Attorney General
 Civil Division*

DREW C. ENSIGN
 *Deputy Assistant Attorney General*

PAUL F. STONE
 *Acting Chief,
 National Security Unit
 Office of Immigration Litigation*

LINDSAY M. MURPHY
 *Deputy Chief*

VICTORIA SANTORA
 *Senior Counsel for National Security*

JESSE BUSEN
 *Counsel for National Security
 Office of Immigration Litigation
 U.S. Department of Justice
 P.O. Box 878, Ben Franklin Station
 Washington, DC  20044-0878
 (202) 305-9647*

June 17, 2026

ATTORNEYS FOR DEFENDANTS-APPELLANTS

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION ......................................................................5

STATEMENT OF THE ISSUES ...........................................................................5

STATEMENT OF THE CASE ...............................................................................6

I.    The United States Responds to an Increase in Antisemitic
      Violence and National Security Threats Since October 7, 2023 ..............6

II.   Complaint ....................................................................................................7

III.  Motion for a Preliminary Injunction.........................................................8

IV.   The District Court Sets Parameters for Discovery ..................................9

V.    The Bench Trial .........................................................................................10

      A.    AAUP and MESA's Member Witnesses ..........................................10

      B.    AAUP and MESA's Organizational Witness ...................................15

      C.    The Government's Witnesses............................................................15

VI.   Post-Trial Findings of Fact and Rulings of Law....................................17

VII.  January 22, 2026, Remedies Order ..........................................................19

SUMMARY OF THE ARGUMENT.....................................................................20

STANDARD OF REVIEW ...................................................................................23

ARGUMENT .........................................................................................................24

I.    AAUP AND MESA LACKED STANDING..........................................24

      A.    AAUP and MESA Lacked Associational Standing...........................24

      B.    MESA Lacked Organizational Standing ...........................................33

II.    JURISDICTION WAS BARRED BY 8 U.S.C. §§1252(b)(9)
       AND (g) ......................................................................................38

       A.    8 U.S.C. §1252(b)(9).............................................................40

       B.    8 U.S.C. §1252(g) ................................................................46

       C.    None of The District Court's Reasons for Ignoring
             §§1252(b)(9) and (g) Have Merit..........................................49

III.   THE DISTRICT COURT ERRED IN FINDING A FIRST
       AMENDMENT VIOLATION .........................................................51

       A.    Aliens' First Amendment Rights are not Coextensive with
             Citizens' ...............................................................................51

       B.    The District Court Should Have Applied the Facially Legiti-
             mate and Bona Fide Standard ...........................................55

       C.    The District Court Erred in Finding an APA Violation...................58

IV.    THE DISTRICT COURT ERRED IN ENTERING ITS
       SANCTION REMEDY.....................................................................59

CONCLUSION.................................................................................................65

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*AAUP v. Rubio*,
No. 25-10685-WGY, 2026 WL 686418 (D. Mass. Mar. 11, 2026)...................49

*Aguilar v. ICE*,
510 F.3d 1 (1st Cir. 2007) .......................................................1, *passim*

*Alexander v. Sandoval*,
532 U.S. 275 (2001)..................................................................64

*Alvidres-Reyes v. Reno*,
180 F.3d 199 (5th Cir. 1999).......................................................45

*Bivens v. Six Unknown Fed. Narcotics Agents*,
403 U.S. 388 (1971)..................................................................64

*Blum v. Holder*,
744 F.3d 790 (1st Cir. 2014) ......................................................29

*California v. Texas*,
593 U.S. 659 (2021)..................................................................32

*Carlson v. Landon*,
342 U.S. 524 (1952)..................................................................55

*Chapinski v. Ziglar*,
278 F.3d 718 (7th Cir. 2002).......................................................45

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..........................................................24, *passim*

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952))..................................................................52

*Costa v. de Lima,*
94 F.4th 174 (1st Cir. 2024)......................................................................23

*DHS v. D.V.D.,*
145 S. Ct. 2153 (2025)..............................................................................63

*Deep S. Ctr. for Env't Just. v. EPA,*
138 F.4th 310 (5th Cir. 2025)...................................................................34

*Demore v. Kim,*
538 U.S. 510 (2003)............................................................................ 53-54

*Department of State v. Muñoz,*
602 U.S. 899 (2024)........................................................................ 54-55, 57

*Doc Soc'y v. Rubio,*
141 F.4th 1273 (D.C. Cir. 2025) ...............................................................32

*Donahue v. City of Boston,*
304 F.3d 110 (1st Cir. 2002) .....................................................................31

*E.F.L. v. Prim,*
986 F.3d 959 (7th Cir. 2021)....................................................................47

*Elend v. Basham,*
471 F.3d 1199 (11th Cir. 2006).................................................................33

*Elgharib v. Napolitano,*
600 F.3d 597 (6th Cir. 2010)....................................................................48

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024).....................................................................31, *passim*

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022)..................................................................................60

*Gasperini v. Ctr. For Humanities, Inc.,*
518 U.S. 415 (1996)..................................................................................62

*Graham v. Richardson,*
   403 U.S. 365 (1971).............................................................................52

*Grupo Mexicano De Desarrollo v. All. Bond Fund,*
   527 U.S. 308 (1999).............................................................................63

*Haig v. Agee,*
   453 U.S. 280 (1981).............................................................................54

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982).......................................................................34, 35

*Hernandez v. Mesa,*
   593 U.S. 93 (2020)...............................................................................64

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010).................................................................................53

*Humphries v. Various Fed. USINS Emps.,*
   164 F.3d 936 (5th Cir. 1999)..............................................................48

*J.E.F.M. v. Lynch,*
   837 F.3d 1026 (9th Cir. 2016).............................................................41

*Jimenez-Angeles v. Ashcroft,*
   291 F.3d 594 (9th Cir. 2002).......................................................... 47-48

*Johnson v. Eisentrager,*
   339 U.S. 763 (1950).......................................................................53, 54

*Jones-El v. Berge,*
   374 F.3d 541 (7th Cir. 2004)..............................................................60

*Khalil v. President, United States,*
   164 F.4th 259 (3d Cir. 2026)....................................................40, *passim*

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)..................................................................18, *passim*

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)...................................................................38

*Kontrick v. Ryan*,
  540 U.S. 443 (2004)....................................................................1

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953)...................................................................53

*Labrador v. Poe*,
  144 S. Ct. 921 (2024).................................................................63

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..........................................................24, 36, 38

*M.M.V. v. Garland*,
  1 F.4th 1100 (D.C. Cir. 2021) .....................................................45

*Mathews v. Diaz*,
  426 U.S. 67 (1976)................................................................. 53-55

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)...................................................................24

*Nieves v. Bartlett*,
  587 U.S. 391 (2019)................................................................ 64-65

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................63

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ..................................................... 55-56

*Rauda v. Jennings*,
  55 F.4th 773 (9th Cir. 2022) ......................................................47

vi

*Reddy v. Foster,*
   845 F.3d 493 (1st Cir. 2017) ...............................................................24, 25, 26

*Reno v. AADC,*
   525 U.S. 471 (1999)..............................................................................2, *passim*

*Riley v. Bondi,*
   606 U.S. 259 (2025)...........................................................................................1

*Simon v. E. Kentucky Welfare Rts. Org.,*
   426 U.S. 26 (1976).....................................................................................36, 38

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016).........................................................................................24

*Steel Co. v. Citizens for Better Environment,*
   523 U.S. 83 (1998..................................................................................31, 39

*Susan B. Anthony Lisa v.* Driehaus,
   573 U.S. 149 (2014)...........................................................................24, 25, 26, 30

*Tazu v. Att'y Gen. of the United States,*
   975 F.3d 292 (3d Cir. 2020) ..........................................................................46

*Texas State LULAC v. Elfant,*
   52 F.4th 248 (5th Cir. 2022) .........................................................................34

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025)..........................................................................................63

*Trump v. Hawaii,*
   585 U.S. 667 (2018)....................................................................................54, 56

*Turner v. Williams,*
   194 U.S. 279 (1904)..........................................................................................52

*United States v. Texas,*
   173 F.4th 659 (5th Cir. 2026)................................................................35

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990)...........................................................................53

*Warth v. Seldin,*
   422 U.S. 490 (1975)...........................................................................36

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017)...........................................................................64

## STATUTES

**Immigration and Nationality Act of 1952, as amended:**

8 U.S.C. § 1182(a)(2) ............................................................................61

8 U.S.C. § 1201(i)............................................................10, 39, 40, 57

8 U.S.C. § 1227(a)(2) ............................................................................61

8 U.S.C. § 1227(a)(4)(C)............................................................ 9, passim

8 U.S.C. § 1227(a)(4)(C)(i) ................................................................32

8 U.S.C. § 1227(a)(4)(C)(ii) ...............................................................32

8 U.S.C. § 1229a ...........................................................................39, 60

8 U.S.C. § 1231 ....................................................................................60

8 U.S.C. § 1252(a)(5) ........................................................21, 40, 41, 65

8 U.S.C. § 1252(b)(9)............................................................1, *passim*

8 U.S.C. § 1252(f)(1)............................................................2, *passim*

8 U.S.C. § 1252(g)................................................................2, *passim*

28 U.S.C. § 1331 ..............................................................................................5

28 U.S.C. § 1291 ..............................................................................................5

28 U.S.C. § 1292(a)(1) .....................................................................................5

## **FEDERAL RULES OF APPELLATE PROCEDURE**

Fed. R. Civ. P. 52(a)(6) ..................................................................................23

Fed. R. Civ. P. 65(d)(2) ..................................................................................62

Federal Rule of Civil Procedure 65 ..........................................................22, 62

## **OTHER AUTHORITIES**

Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90
    Fed. Reg. 8847 (Jan. 29, 2025)..............................................................6, 7

Executive Order 14161, Protecting the United States from Foreign
    Terrorists and Other National Security and Public Safety Threats, 90 Fed.
    Reg. 8451.................................................................................................6, 7

Nos. 26-1141 & 26-1195

# In the United States Court of Appeals for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

*Plaintiffs – Appellees,*

v.

MARCO RUBIO, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, ET AL.,
*Defendants – Appellants.*

*On Appeal from the U.S. District Court
for the District of Massachusetts
Docket No. 1:25-cv-10685-WGY*

## BRIEF FOR DEFENDANTS – APPELLANTS

## <u>INTRODUCTION</u>

"A federal court must always satisfy itself that it has jurisdiction." *Riley v. Bondi*, 606 U.S. 259, 273 (2025). And "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004). Congress did just that when it enacted the Immigration and Nationality Act ("INA"), and it knew what it was doing. Because removal proceedings were mired in a "scattershot and piecemeal" review process, Congress enacted the "zipper clause," 8 U.S.C. § 1252(b)(9), to make judicial review "available only" from a final order of removal. *Aguilar v. ICE*, 510 F.3d

1, 9 (1st Cir. 2007). Because of the "particular evil" of "attempts to impose judicial constraints upon prosecutorial discretion," *Reno v. AADC*, 525 U.S. 471, 485 n.9 (1999), Congress decided that "no court shall have jurisdiction" to challenge the decision "to commence proceedings, adjudicate cases, or execute removal orders against any alien" outside of a petition for review, 8 U.S.C. § 1252(g). And to further limit judicial interference with the execution of the immigration laws, Congress generally provided that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain" removal proceedings as to non-named parties.  8 U.S.C. § 1252(f)(1).

Under those principles, this case should have been an easy dismissal. Two academic organizations, the American Association of University Professors ("AAUP") and the Middle East Studies Association ("MESA") initiated this lawsuit to challenge a  so-called "ideological deportation policy,"  which they say is a "large-scale" policy of "arresting, detaining, and deporting" noncitizen students and faculty engaged in "pro-Palestinian protests" and related "expression and association." But their sensationalist labeling cannot hide their suit's fatal defects. AAUP and MESA could not identify any of their own members at who triggered such a policy. The only pieces of evidence they could conjure up that their putative ideological deportation policy even exists

are cherry-picked public statements and the removal or visa revocation non-party and non-member aliens, for whom each action was independently justified. And even if they had plausibly alleged such a policy, the proper route to challenge it is the one Congress provided—through a petition for review from a final order of removal, not a broad programmatic challenge. Indeed, many of the non-party aliens at issue are now pursuing just such review now.

Nonetheless, the district court plowed ahead in a rush to the merits. In an order that begins with a postcard and ends with political commentary in the literary guise of a fictional dialogue with the district judge's spouse, the district court held that AAUP and MESA have associational standing because the alleged policy chilled their members' speech, and that MESA has organizational standing because the alleged policy "harm[s] its core activity of facilitating academic discourse." Add.181. It then proceeded to hold that the alleged policy violates the First Amendment because, in its view, "non-citizens lawfully present here in [sic] United States actually have the same free speech rights as the rest of us." *Id.* at 131. The district court was no less inventive at the remedial hearing, where—at the request of no one—it purported to grant every AAUP and MESA member the ability to file an action in any court to automatically stay their removal.

- 3 -

All of that is quintessential judicial overreach. There is no Article III case or controversy when there is only *unreasonable* fear of enforcement. Nor can Congress's limitations on judicial review of removal orders be evaded simply by conjuring some deportation "policy" out of cherry-picked examples. And there is no escaping the fact that, in the immigration context, the Government need only provide a "facially legitimate and bona fide" (i.e., good faith) reason for the challenged action, and that standard is easily satisfied here. In any event, the district court's unprecedented stay-upon-demand remedial regime is indefensible—which is presumably why AAUP and MESA did not oppose the Government's motion to stay the remedy pending appeal (which this Court granted).

This Court should vacate the decision below and order the dismissal of this action.

## STATEMENT OF JURISDICTION

AAUP and MESA invoked jurisdiction under 28 U.S.C. §1331, Joint Appendix ("JA") at 291, which the Government disputes. *See infra* at pp.39-51.

The district court entered partial final judgment under Rule 54(b) on January 22, 2026. Add.230. The Government timely appealed on February 9. JA.81. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether AAUP and MESA lacked standing to bring this action.

2.    Whether 8 U.S.C. §§1252(b)(9) & (g) divested the district court of jurisdiction over AAUP and MESA's claims.

3.    Whether the district court erred in finding a First Amendment violation.

4.    Whether the district court's remedy is unlawful.

## STATEMENT OF THE CASE

**I.  The United States Responds to an Increase in Antisemitic Violence and National Security Threats**

Upon taking office, President Trump issued two Executive Orders to address antisemitism and national security. Executive Order 14188, *Additional Measures to Combat Anti-Semitism*, responds to "an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence … especially in" schools, that arose from the Israeli-Hamas conflict. 90 Fed. Reg. 8847 (Jan. 29, 2025). It directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* §2.

Executive Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 8451, declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." EO 14161, § 1(a). It seeks to ensure aliens "do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.*

- 6 -

Both EOs require their implementation to be consistent with applicable law. EO 14161, § 4(a)(i)-(ii); EO 14188, § 4(b).

## II.    Complaint

On March 23, 2025, AAUP and MESA[1] filed a complaint in the District of Massachusetts alleging that in implementing EOs 14161 and 14188, the Department of Homeland Security ("DHS") and the Department of State ("State") were carrying out an "ideological-deportation policy" ("IDP"), JA.289, which they described as a "large-scale" policy of "arrest[ing], detain[ing], and deport[ing]" noncitizen students and faculty engaged in "pro-Palestinian protests" and related "expression and association." JA.299. To prove the alleged IDP's existence, AAUP and MESA relied on public officials' statements and high-profile immigration enforcement actions taken against individuals who were not members of either organization. *See* JA.296-305.

AAUP and MESA alleged four causes of action—two First Amendment claims (Counts I-II), one Fifth Amendment claim (Count III), and an APA claim (Count IV). Relevant here, Count I alleged that the IDP violated the First Amendment because it directs the arrest, detention, and deportation of

---

[1] Several chapters of AAUP also filed suit but were found to lack standing. Add.9-10.

aliens based on their political viewpoints. Count II alleged that the IDP violated the First Amendment because it involved coercive threats that unconstitutionally chilled speech. JA.333-34. And Count IV alleged the IDP violates the APA. JA.334.

## III.    Motion for a Preliminary Injunction

On April 1, 2025, AAUP and MESA asked the Court to preliminarily enjoin "Defendants from threatening to arrest, detain, and deport noncitizen students and faculty based on their lawful political expression," and to stay the IDP under the APA. Dkt. ##13 & 14. The Government opposed on standing and statutory jurisdiction grounds. Dkt. #65 at 4-18. The district court "collapsed the motion into a trial on the merits pursuant to Rule 65(a)." Add.4 n.3. And it "construed [the Government's] opposition … as a motion to dismiss." *Id.*

On April 29, 2025, the district court denied the motion to dismiss. Add.1-68. It rejected the Government's jurisdictional arguments, found AAUP and MESA sufficiently alleged associational standing, and found MESA sufficiently alleged organizational standing. Add.22-38, 44, 52. The First Amendment and APA claims survived, Add.55-67, but the district court dismissed the Fifth Amendment claim. Add.61-63.

## IV.   The District Court Sets Parameters for Discovery

Over the Government's objections, the district court ordered it to produce discovery relating to five non-party aliens, whom AAUP and MESA alleged illustrated the IDP:  Mahmoud Khalil, Moshen Mahdawi, Yunseo Chung, Badar Khan Suri, and Rumeysa Öztürk. Dkt #102 at 9-10.  None of these individuals is a party to this litigation or a member of AAUP or MESA.

The documents produced showed that the Secretary of State determined that the activities and presence in the United States of Khalil, Mahdawi, and Chung, all of whom were lawful permanent residents ("LPR"), and Suri, who was in valid nonimmigrant status as a research scholar, "would have potentially serious adverse foreign policy consequences and compromise a compelling U.S. foreign policy interest," and that they were therefore removable under 8 U.S.C. §1227(a)(4)(C). JA.1564, 1572, 1589, 1592.

- The Secretary's determination regarding Khalil was based on his leadership role "in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States," and on his unlawful activity during those protests. JA1565; *see* JA.2161-65, 2197-98, 2207-11.

- The Secretary's determination regarding Mahdawi was based on his "anti-Semitic conduct," specifically, his leadership of and involvement in disruptive protests, where he was "identified … as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders," and "calling for Israel's destruction." JA.1573; *see* JA.2173-78, 2101-02, 2212-16.

- 9 -

- The Secretary's determination regarding Chung was based on her "role … in antisemitic protests and disruptive activities, which foster[ed] a hostile environment for Jewish students in the United States," as well as on her "citations for unlawful activity during these protests." JA.1590; *see* JA.2179-81, 2199-2200, 2207-11.

- The Secretary's determination regarding Suri was based on an assessment that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities … [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization." JA.1593. In addition, Suri was "actively supporting Hamas terrorism" and "actively spread[ing Hamas] propaganda and promot[ing] antisemitism on social media." JA.1593; *see* JA.2166-72, 2205-06, 2217-21.

Öztürk was not an LPR and had an unexpired visa. State revoked her visa under 8 U.S.C. §1201(i), which allows the Secretary of State and consular officers to revoke visas as a matter of discretion, finding that she "had been involved in associations that may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." JA.1582.

## V.    The Bench Trial

The district court held a nine-day bench trial between July 7 and 18, 2026, taking testimony from several witnesses for AAUP and MESA and the Government. JA.337-1519.

### A.    AAUP and MESA's Member Witnesses

AAUP and MESA proffered several members to testify about the supposed chill resulting from the alleged IDP. Although these members testified

that they refrained from certain activities due to immigration actions taken against the five individuals discussed above, none testified about (1) any adverse immigration action taken against them personally; (2) being contacted by the Government about their speech; or (3) any specific government policy they could identify chilling their speech.

1.     Megan Hyska, an LPR and AAUP member, testified that she feared arrest and deportation for engaging in political activity, and so chose to self-censor, based on the arrests of Khalil and Öztürk. JA.379-80, 390, 395. She testified that she changed her mind about becoming more active with the Democratic Socialists of America, an organization aligned with pro-Palestinian causes, and decided not to publish an op-ed critical of the Trump Administration. JA. 379-80, 395.

Hyska did not identify any immigration enforcement actions directed at her; rather, her fears were based solely on reviewing internet reports about others. JA.420 ("I just know what I see in reporting"); JA.425 (referencing "clusters of social media posts around the detention of Mr. Khalil"); JA.426 (admitting she was never personally contacted by the Government about her speech).

2. Nadia Al-Ali, an LPR and AAUP and MESA member, testified that she altered international travel plans following Khalil's arrest, feeling that her pro-Palestinian speech put her at risk of being "flagged" upon return to the United States, JA.470-71, and halted separate work-related plans to travel to Beirut and Baghdad. JA.467-68, 476. She further testified that she abandoned plans to write an article providing a "feminist critique of Hamas" because it would have included "a feminist critique of the Israeli government policies." JA.468-69; 478. She also (1) declined to sign letters or facilitate meetings regarding the situation in Israel and Palestine, despite having done these things prior to her arrest, JA.529-30; (2) did not attend MESA's 2025 annual meeting, JA.479-80; (3) declined chairing the human rights committee of the Women's Association of Middle East Studies, believing it would be "too risky," JA.480-81; and (4) refrained from protesting after March 2025, fearing that as a noncitizen she "would be … vulnerable." JA.546.

Nonetheless, Al-Ali admitted that her ample scholarship includes only two works touching upon Palestine, JA.461, and she has no social media postings on the subject. JA.482-83. She was one of many signatories on three letters to Brown's president relating to the Israeli–Palestinian conflict. JA.522, 525-26, 527.

- 12 -

3.      Bernhard Nickel, an LPR and AAUP member, testified that Khalil's arrest, which he read about, "scared [him]," and made him fear "political reprisal." JA.593-94. He testified that Öztürk's arrest caused him to refrain from traveling internationally based on fear of "being detained at the border when [trying] to re-enter" the United States. JA.598-600. Nickel feared that his past political speech, such as his signature on a 2019 open letter to the Director of the U.S. Holocaust Museum and his signature on a 2021 Harvard faculty statement in support of Palestinian liberation, created a "heightened risk" that the Government would target him for deportation. JA.607-611 (discussing JA.1883-1914). Nickel stated that following Khalil's arrest he attempted not to "draw attention to [himself]," fearing that he "might potentially be the target of something." JA.597. He "stopped going to protests," "stopped signing on to public letters," and "cancelled international travel." JA.565.

Nickel admitted that he has never been contacted by the Government about his political views or received any indication that it has been monitoring his speech. JA.625. Prior to President Trump's election, the only public acts he was associated with were his signatures on two letters where he was among hundreds of signatories. JA.608-11.  Ultimately, Nickel acknowledged that he

did not believe that any enforcement action was imminent: "[Do I believe] that it would definitely happen? No." JA.611.

4.     Brian Shuve, an AAUP member, testified that he belonged to Claremont Colleges' Faculty for Justice in Palestine ("FJP"), JA.1520-21, an organization which publicly supports Palestine and criticizes Israel. JA.1524. Shuve said he was the member representative for Harvey Mudd College's AAUP chapter, through which he published a statement about "the ability of scholars to speak on contentious issues specifically with respect to Israel and Palestine." JA.1521-22. During AAUP's April 2025 National Day of Action, his AAUP chapter hosted a meeting and participated in a webinar discussing issues including Palestine. JA.1523-24. Shuve was also involved in drafting multiple statements for FJP relating to Palestine and Gaza, JA.1525-26, and participated in an FJP public demonstration in the spring of 2025. JA.1526-28.

Shuve testified that his history of public, pro-Palestinian speech, JA.1521-22, 1524-27, 1529-30, left him fearful of being arrested at his April 23, 2025, naturalization interview. JA.1535-36. However, rather than being penalized for his pro-Palestinian views, following a 20-minute interview, he was granted citizenship. JA.1530.

- 14 -

5. Finally, Nadia Abu El Haj, a U.S. citizen, professor at Barnard College and Columbia University, and AAUP and MESA member, testified that Khalil's arrest created "a sort of anxiety and panic about what might happen next," JA.667, and Mahdawi's arrest "escalated a sense of anxiety and panic at Columbia." JA.683-84.

## B. AAUP and MESA's Organizational Witness

Veena Dubal, the General Counsel of AAUP and a MESA member, JA.1415-1449, testified that AAUP has approximately 50,000 members. JA.1418. She explained that following Khalil's arrest, AAUP and MESA expended resources and co-hosted town-halls to assist noncitizen members in avoiding similar enforcement actions. JA.1421, 1424, 1427-29, 1436-38. She acknowledged that since the 2024 election, AAUP had expanded its number of chapters, which "help[ed] the organization" and "increased [its] ability" to carry out its mission. JA.1440-41.

## C. The Government's Witnesses

The Government's witnesses testified about the processes for evaluating and referring individuals for immigration enforcement actions, and for making removability and visa revocation determinations. The Government

also presented testimony showing the political activity of AAUP and MESA had *increased* since the beginning of 2025.

1.    Andre Watson, the then-Assistant Director of the National Security Division ("NSD") within ICE's Homeland Security Investigations ("HSI") unit, and Peter Hatch, the Assistant Director of the Office of Intelligence ("OI") within HSI, testified about the process for evaluating referrals for potential enforcement actions and the mechanism for implementing EOs 14161 and 14188. JA.876-77, 884, 1277, 1279. In short, concerning 2025 protestor referrals, OI forwarded about 200 referrals, called Reports of Analysis ("ROA"), out of 5,000 leads to NSD, which forwarded only between 20 and 30 to State, JA.1286-87—less than 1% of the total number of leads.

2.    John Armstrong, the Senior Official at the State Department's Bureau of Consular Affairs, testified that if NSD refers a nonimmigrant visa holder, the information is sent to the Visa Office within the Bureau of Consular Affairs, which "examines the information" to determine whether it warrants "enact[ing] a revocation" of the visa, and if so, revokes. JA.1000-01, 1003 (discussing JA.2226).

In the case of an LPR, State cannot "revoke [the individual's] status," instead, "the Secretary of State can [make] a finding that th[e] person is removable" under 8 U.S.C. §1227(a)(4)(C). JA.1002 (discussing JA.2226).

3.    Mohamed Maklad, an HSI supervisory analyst, testified as a summary witness about the publications and public events of AAUP and MESA since January 2025. JA.1237. Specifically, the number of events at AAUP's National Day of Action in 2025, which MESA co-sponsored, and which was intended to promote "engage[ment] in free speech activities across college campuses," was a *2000 percent increase*—from 9 events in 2024 to 191 events in 2025. JA.1247-1248 (discussing JA.2193-96). The exhibits he discussed further show that AAUP's website promoted a significantly greater number of political events in the first six months of 2025 than in all of 2024. JA.1240-44 (discussing JA.2193-96).

## VI.    Post-Trial Findings of Fact and Rulings of Law

On September 30, 2025, the district court found the Government violated the First Amendment and APA. Add.69-229. It reiterated its prior determination that both AAUP and MESA "had associational standing … and that at least MESA had organizational standing," Add.170, because it had demon-

strated harm to "its core activity of facilitating academic discourse and scholarship about issues impacting the Middle East." Add.181-82. And while the district court concluded "[t]here was no ideological deportation policy," Add.163, it found there was a "mode of enforcement" Add.191, where the "Secretaries initiated removal proceedings against a few … for speaking out … with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome." Add.163; *see also* Add.176-180, 191.

On the merits, the district court found in favor of AAUP and MESA on viewpoint discrimination (Count I). It held that noncitizens' free speech rights were equal to those of citizens but declined to decide what legal standard governed. Add.193. Instead, the court found liability "even under the 'facially legitimate and bona fide' standard'" from *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). Add.193. It also found in favor of AAUP and MESA on their APA claim (Count IV) because the so-called mode of enforcement was contrary to the First Amendment and reversed prior policy without reasonable explanation. Add.169.

## VII.  January 22, 2026, Remedies Order

The district court issued an annotated judgment and remedies order, Add.230-39, entering judgment for AAUP and MESA on Counts I and IV, Add.231, and declaring that Secretaries Noem and Rubio implemented EOs 14161 and 14188 in a "viewpoint discriminatory way to chill protected speech," thereby "violat[ing] the First Amendment." Add.231 (internal quotations omitted). It ordered the "Public Officials' enforcement policy and the implementation thereof ... [to be] of no effect, void, illegal, set aside, and vacated" under the APA. Add.232 (emphasis omitted).

Additionally, it issued a sanction that AAUP and MESA never requested, permitting any current member of AAUP or MESA who was a member on or after the filing of the complaint on March 25, 2025—a "Sanction Plaintiff"— to institute a "Sanction Action" in the U.S. District Court where he or she resides. Add.233. The Sanction Action may challenge any "adverse immigration action changing [the] Sanction Plaintiff's immigration status from what it was on January 20, 2025." Add.233-34. A Sanction Plaintiff's removal is automatically stayed during the pendency of the action, and the Government bears the burden of determining whether a Sanction Action has been filed.

- 19 -

Add.235-36. In such an action, it is "presumed that the alteration in immigration status is in retribution for the exercise … of First Amendment rights." Add.234. The Sanction Action "voids the alteration in immigration status" unless the Government rebuts the presumption of retribution with clear and convincing evidence that (1) a Sanction Plaintiff's immigration status expired by its own terms; (2) a Sanction Plaintiff was convicted of a crime to which a jury-trial right attached; or (3) there is an appropriate reason for the action. Add.234-35.

The Government moved for a stay pending appeal below. Dkt. #317. Even though it was largely unopposed, the district court denied it almost entirely. Dkt. #330. The Government then renewed that request in this Court, which was also unopposed and then granted. Order, Apr. 7, 2026, Dkt. Nos. 26-1141 & 26-1195.

## SUMMARY OF THE ARGUMENT

I.    AAUP and MESA brought this case challenging a so-called ideological deportation policy, but they identified no members who had been subject to it or even directly threatened by it. AAUP and MESA thus lack standing. Their third-party challenges to immigration enforcement choices fail because third parties cannot challenge the Executive's enforcement discretion.

- 20 -

Additionally, AAUP's and MESA's members established no injury beyond a subjective chill prompted by their anxiety and speculation. In fact, one AAUP member who continued pro-Palestinian speech successfully naturalized after a twenty-minute interview. Even if AAUP's and MESA's members suffered an injury, it is too attenuated because it is based on speculative fear stemming from others' injuries. MESA lacks organizational standing because it has no specific legal right that the Government allegedly violated and it has not otherwise established a redressable injury-in-fact traceable to the challenged policy.

II.    The district court's decision exceeded its jurisdiction. Federal courts have limited jurisdiction, and Congress specifically withdrew jurisdiction to review decisions and actions to place aliens in removal proceedings. 8 U.S.C. §§1252(b)(9) & (g). Instead, it channeled those claims into removal proceedings reviewable in the courts of appeals. 8 U.S.C. §1252(a)(5). MESA and AAUP's claims rest on two premises, neither of which the district court had jurisdiction to consider . First, the Government violated the rights of non-party aliens by placing them in removal proceedings on account of their protected speech. Second, that AAUP and MESA's members reasonably feared being similarly placed in removal proceedings.

- 21 -

But Congress directed that both types of claims be channeled into removal proceedings. Otherwise, it would set up a race to the courthouse where aliens can get pre-enforcement review of their claims so long as they file before immigration proceedings are commenced. This they cannot do.

III.    Even assuming jurisdiction, under 8 U.S.C. §1252(f)(1) the district court lacked authority to enter injunctive relief restraining the implementation of removal proceedings as to non-named parties. The court likewise lacked authority to create a new cause of action in other courts because they, too, lack jurisdiction under §§1252(b)(9) & (g). In creating this new cause of action, the district court exceeded its equitable authority and its authority under Federal Rule of Civil Procedure 65.

IV.    On the merits, the district court also erred in finding a First Amendment violation. The Supreme Court has already held that the First Amendment does not prohibit the United States from deporting aliens for their political beliefs and associations. At most, AAUP and MESA's claims are reviewed under the highly deferential "facially legitimate and bona fide" standard. Under that standard, courts only look to the legal justification proffered by the agency and, if facially valid, the review ends. The district court did not just look behind the agency decisions here, it permitted extensive and

- 22 -

burdensome discovery into, and review of, every action taken to remove five aliens who were not even parties to the litigation. At most, the district court should have looked at the face of the agencies' justifications, which are facially legitimate and bona fide, and ended its inquiry there. These errors, too, infected the district court's APA violation finding.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions *de novo*. *See da Costa v. de Lima*, 94 F.4th 174, 180 (1st Cir. 2024) (citations omitted). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." *Id.* (quoting Fed. R. Civ. P. 52(a)(6)). The appropriate standard of review for mixed questions of law and fact depends on whether it "entails primarily legal or factual work." *Id.* (citations and quotations omitted).

## ARGUMENT

## I.    AAUP AND MESA LACKED STANDING

### A.    AAUP and MESA Lacked Associational Standing

1.    An association may have standing if, among other requirements, at least one member has Article III standing to sue in the member's own right. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343

(1977). Article III standing, in turn, "requires that an injury be concrete, par-

ticularized, and actual or imminent; fairly traceable to the challenged action;

and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*,

561 U.S. 139, 149 (2010). To establish an injury in fact, a plaintiff must show he

"has sustained or is immediately in danger of sustaining a direct injury" be-

cause of the challenged action. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 346 (2016)

(Thomas, J., concurring) (citations omitted). The injury must be "concrete and

particularized," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations

omitted), and not merely "conjectural or hypothetical." *Susan B. Anthony*

*Lisa v. Driehaus* ("*SBA List*"), 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504

U.S. at 560).

In pre-enforcement First Amendment challenges, the Supreme Court

has "repeatedly reiterated that threatened injury must be certainly impend-

ing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). But a claim of

future injury may also suffice if "there is a 'substantial risk' that the harm will

occur." *SBA List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 415, n.5); *see*

*also Reddy*, 845 F.3d at 500 ("injury is imminent if it is certainly impending *or*

if there is a substantial risk that harm will occur"). A plaintiff satisfies the

"substantial risk of harm" standard where he has alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 159. Under either framework, mere "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409; *see also SBA List*, 573 U.S. at 158.

Both AAUP and MESA lacked associational standing because none of their members established an injury-in-fact. Their members' claimed injury was *self*-censorship based purely on their subjective assessments of the Government's reasons for taking immigration enforcement actions against other individuals. *See* JA.379-80, 390, 395 (Hyska on self-censoring after learning of Khalil's and Öztürk's arrests); JA.467-68, 470-71, 476, 478 (Al-Ali on choice to abandon plans to write an article, or comment publicly on the situation in Israel and Palestine following Khalil's and Öztürk's arrests); JA.593-94, 598-600 (Nickel regarding how his fear of "political reprisal" caused him to self-censor following Khalil's arrest). But to constitute an injury-in-fact, the chilling effect must stem from something more than "merely … the individual's knowledge that a governmental agency was engaged in certain activities." *Clapper*, 568 U.S. at 418; *see also id.* at 418-20 (rejecting notion that "plaintiffs can establish

- 25 -

standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part"); *SBA List*, 573 U.S. at 159. The threat of injury must be certainly impending, or there must be a substantial risk of that harm, i.e., a credible threat of prosecution under the challenged law. *Reddy*, 845 F.3d at 500. AAUP and MESA established neither.

*First*, their members merely speculated they might come within the universe of people the Government was interested in investigating. JA.1530, 1535-36 (Shuve generally fearful of arrest and detention, but actually obtained citizenship on April 23, 2025); JA.667, 683-84 (El-Haj felt "anxiety and panic" after Mahdawi's and Khalil's arrests); JA.420, 425-26 (Hyska had general fears based on internet reporting); JA.468-69, 470-71, 478 (Al-Ali's fears stemmed from hearing about Khalil's arrest); JA.593-94, 597, 625 (Nickel feared "political reprisal" after reading about Khalil's arrest).

*Second*, even assuming a future investigation, AAUP and MESA provided no evidence that it would reveal information supporting immigration enforcement. *Compare* JA.2197-98 (report that Khalil *led* disruptive protests, including the occupation of university buildings), *with* JA.1520-21, 1525-28 (membership in organization that publicly supports Palestine, drafting public

statements, and participating in demonstrations), *and* JA.522, 525-27, 607-11 (signing onto letters supporting Palestine), *and* JA.468-69, 478 (writing scholarly articles critiquing Hamas).

*Third*, AAUP and MESA offered nothing to show that such future, hypothetical action would be based on protected speech rather than general noncompliance with visa terms or some other unrelated basis for removal. *See* JA.1569 (Khalil NTA charging removability for willfully misrepresenting material facts on his LPR application).

*Finally*, even if they showed that certain Government actors might pursue enforcement action based on protected speech, AAUP and MESA offered no concrete evidence that such action would be approved, especially when so few campus protester leads (less than 1%) were even forwarded for *potential* enforcement action, JA.1286. *See Clapper*, 568 U.S. at 413 (expressing reluctance to find standing where it "require[s] guesswork as to how independent decisionmakers will exercise their judgment").

Notably, the record shows that none of the consequences AAUP's and MESA's members claim to fear—arrest, detention, and deportation—have come to fruition. They never identified a member targeted for enforcement under the challenged policy despite their members' continued engagement in

behaviors that they characterized as "risky." *See* JA.399, 402, 432-33 (Hyska describing continue attendance at political protests); JA.551-52 (Al-Ali testifying she followed through with plans to give talks abroad and was permitted to reenter the U.S.); JA.607-611 (Nickel testifying he still sent large group emails to colleagues and students in March and April 2025).

In fact, evidence AAUP and MESA provided showed that their members' fears were *unreasonable*. For example, Brian Shuve claimed that his public, pro-Palestinian speech between late-2023 and mid-2025, JA.1521-22, 1524-26, 1529-30, left him fearful of arrest and detention when he attended his April 23, 2025, naturalization interview. JA.1534. Indeed, the volume of his public speech in support of Palestine, including drafting website statements about Palestine and Gaza, his membership in FJP, his participation in an FJP public demonstration in the spring of 2025, and his leadership role at Harvey-Mudd-AAUP, far exceeded the public political profile of the other testifying witnesses. JA.1520-21, 1523-34. Nonetheless, Shuve was naturalized after an uneventful twenty-minute interview. JA.1530.

Even the district court found that there "was no ideological deportation policy. It was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens." Add.163. Rather, enforcement action "target[ed] a few"

- 28 -

noncitizens, *id.* at 173, none of whom are witnesses or parties in this case. Add.203-04 (district court finding that AAUP and MESA "have not produced evidence of threats targeted specifically at their members" and therefore have "not proved a campaign of coercion" to be able to prevail on Count II).

Because the facts showed that enforcement actions relating to pro-Palestinian speech are rare and no enforcement threat has been identified as to any of their members, MESA and AAUP failed to establish the injury-in-fact required for standing. *See Blum v Holder*, 744 F.3d 790, 799 (1st Cir. 2014) (upholding no standing in a chill case where enforcement "has been rare and has addressed actions taken that are different from those plaintiffs propose to undertake"). AAUP's and MESA's members' fears boil down to "a subjective chill based on speculation about potential governmental action," which has yet to occur to any of their members, and thus falls far short of the "concrete evidence to substantiate their [members'] fears" that they were required to present to establish associational standing. *Clapper*, 568 U.S. at 420 (citation omitted); *accord SBA List*, 573 U.S. at 158.

2.      AAUP's and MESA's claimed injuries also are not traceable to the challenged putative policy but rather arise from the fear and self-chilling be-

- 29 -

havior of certain of their members, based on hypothetical potential immigration enforcement. *See, e.g.,* JA.390, 470; JA.598-600; JA.1534-35. There is no concrete evidence directly linking the challenged putative policy and any harm or even threat of harm to AAUP's and MESA's members. Rather, the crux of their case is that other non-similarly-situated individuals who are not implicated in this litigation (e.g., Khalil and the other four so-called "targeted" individuals) suffered injuries (immigration enforcement actions), which caused AAUP's and MESA's members to restrict their speech out of fear that a similar (though not-yet-threatened) action may befall them. *See, e.g.,* JA.395, 479-80; JA.529-30, 598-600.

But absent a "certainly impending" harm, plaintiffs "cannot manufacture standing merely by inflicting harms on themselves based on their fears of hypothetical future harm." *Clapper*, 568 U.S. at 416. Any injury AAUP's and MESA's members incurred is traceable not to any so-called IDP, but rather to their subjective fears. This sequence of events illustrates the "overly attenuated" connections that the traceability requirement seeks to bar. *Donahue v. City of Boston*, 304 F.3d 110, 115 (1st Cir. 2002); *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement also rules out attenuated links.).

- 30 -

3.    Even if AAUP's and MESA's members' self-inflicted injuries could establish an injury in fact, they have failed to show such an injury is redressable. *See Steel Co.*, 523 U.S. at 103. AAUP and MESA failed to identify a nonspeculative likelihood that an injunction against the policy or a declaration that it is unlawful would redress their injury. JA.334-35. The challenged putative policy does not vest the Government with any new or additional authority not already conveyed by statute.  Thus, while their members maintain that they would discontinue their self-censorship if the putative policy were not in force, they fail to explain why that would ease their fears given that any future adverse action would be based on enforcement of valid immigration statutes that have been in effect for decades.

For example, for years, Congress has allowed deportation where the Secretary of State has reasonable ground to believe an alien's "presence or activities" in the United States "would have potentially serious adverse foreign policy consequences." 8 U.S.C. §1227(a)(4)(C)(i). These consequences could attach to otherwise lawful "past, current, or expected beliefs, statements, or associations" if the Secretary determines that the alien's presence in the United States "would compromise a compelling United States foreign policy interest."

8 U.S.C. §1227(a)(4)(C)(ii); *see also* JA.346 (district court recognizing 8 U.S.C. §1227(a)(4)(C) has "been on the books for quite some time").

Thus, even without the challenged enforcement policy, AAUP's and MESA's noncitizen members had reason to restrict their speech, which defeats a causal link between their self-censoring and the challenged policy. *See, e.g.*, JA.2163 (Khalil restricted his protest activity during the prior administration); *see also Clapper*, 568 U.S. at 417; *California v. Texas*, 593 U.S. 659, 679 (2021) (holding that plaintiffs could not trace their asserted injury "to enforcement of [an] 'allegedly unlawful' provision of [an Act]" where "other provisions of [the] Act, impose[d]" the requirements about which plaintiffs complained). Because enjoining the alleged mode of enforcement policy would leave in place all immigration statutes, which is what provides the Government with the authority to take immigration enforcement actions—AAUP's and MESA's claimed injuries are not redressable here. *See Doc Soc'y v. Rubio*, 141 F.4th 1273, 1279 (D.C. Cir. 2025) (no redressability where plaintiffs' members failed to explain why they would feel comfortable returning to the actions they ceased "if the social media policy were vacated").

Finally, the lack of any injury-in-fact creates a serious obstacle to the district court's ability to redress AAUP's and MESA's alleged harms "beyond

abstractly commanding the [defendants] to obey the First Amendment." *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006). Given the attenuated, speculative, and prospective nature of AAUP's and MESA's alleged harm, the district court lacked the details necessary to resolve the hypothetical constitutional infirmity that their members subjectively fear. "Such a claim is not fit for adjudication." *Id.* at 1212.

## B.  MESA Lacks Organizational Standing

The district court erred in finding that MESA had organizational standing. Organizations may "sue on their own behalf for injuries they have sustained," *All. for Hippocratic Med.*, 602 U.S. at 393 (quotation omitted), by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Id.* at 393-94. The district court acknowledged that MESA's organizational standing claim was based on an "arguably novel theory" that its members' chilled speech sufficiently harms the organization itself—a claim that it recognized has been rejected elsewhere. Add.183 (citing *Texas State LULAC v. Elfant*, 52 F.4th 248, 256-57 (5th Cir. 2022)). Yet it nonetheless concluded that the alleged IDP "significantly harmed [MESA's] core activity of facilitating academic discourse and scholarship about issues impacting the Middle East,"

such that MESA established this "relatively unusual form of standing." Add.181-183.

That is error. An organization, like any plaintiff, "must show far more than simply a setback to the organization's abstract social interests" to establish standing. *Alliance*, 602 U.S. at 394. And the alleged policy's effect on MESA is nothing if not abstract. The challenged policy does not require MESA to do, or refrain from doing, anything. Nor does it "directly affect" or "interfere with" the organizations' activities, *Alliance*, 602 U.S. at 395; "prevent[]" them "from engaging in [their] advocacy, education, and training activities,"; or "compel[] [them] to take any action," *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 319 (5th Cir. 2025). If standing were conferred on MESA on that basis alone, "any enterprising legal-advocacy organization could repackage a generalized grievance as an 'injury' to its 'core business activities' and manufacture Article III standing every time a new law or regulation goes into effect." *United States v. Texas*, 173 F.4th 659, 666 (5th Cir. 2026) (en banc) (citation omitted).

The district court attempted to frame MESA as a "unique case" like the one in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Add.183 n.37. But the Supreme Court cautioned that *Havens* is "an unusual case" which courts

- 34 -

should "be[] careful not to extend … beyond its context." *Alliance*, 602 U.S. at 396. And what made *Havens* the "unusual" instance of successful organizational standing is that, there, the organization had a specific statutory right to truthful, nondiscriminatory housing information *and* "operated a housing counseling service." *Id.* at 395. Misinformation thus "directly affected and interfered with" the organization's "core business activities" in the same way that a manufacturer "selling defective goods" interferes with the business activities of a retailer. *Id.* That is not the case with MESA. Any interference with MESA's core activity of facilitating discourse can be traced only to speculative fears. *See, supra*, at 26-30.

Here, MESA's circumstances are different. MESA has no legal right that the Government violated. Without that legal right, MESA must satisfy the traditional requirements for standing:  a concrete injury that is actual or imminent, that is "fairly traceable" to the action being challenged, and that can be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. It established none of these.

MESA also speculated that the challenged putative policy could lead to unlawful enforcement action against non-parties (its members), who will let their memberships lapse and not attend the organization's annual meeting,

which will in turn reduce the organization's revenue. Dkt. #179 (Plaintiffs' Pre-Trial Brief) at 32-33. But the Supreme Court has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414; *see also Lujan*, 504 U.S. at 561-62. Rather, "Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976); *Warth v. Seldin*, 422 U.S. 490, 506 (1975) (finding standing lacking where alleged injury resulted from outside forces "rather than … respondents' assertedly illegal acts").

The district court's organizational standing analysis fails even on the facts. It relied primarily on one email describing a decrease in the number of abstracts submitted for proposed publication and pre-organized panels in early 2025 to conclude that the challenged policy "significantly harmed" MESA's core activities. Add.181; *see* JA.2011-12. But the district court made no mention of the Government's evidence showing a *2000 percent increase* in the number of events sponsored by AAUP and MESA from 2024 to 2025. JA.1248. And MESA provided no evidence of harm in the form of reduced

membership or revenue more than a year after this alleged policy came into effect. The only testimony MESA provided to show harm was that of a single member, who claimed to have not attended the organization's 2025 annual meeting or chair the group's human rights committee for fear of government retaliation. J.A.479-80. But one member's testimony about how her subjective fear caused her not to attend one meeting or chair one committee is hardly sufficient to show any injury-in-fact to MESA's core activity of facilitating academic discourse about issues concerning the Middle East. Nor is it indicative of how other MESA members might act such that any injury would be fairly traceable to the Government. *Alliance*, 602 U.S. at 385 (to establish causation in cases where unregulated parties are suing the government, the plaintiff must show "a predictable chain of events leading from the government action to the asserted injury"). Indeed, none of the evidence in this case indicates that current MESA members would let their membership lapse, especially when no member has been harmed under the challenged putative policy.

The speculative fear that immigration enforcement under an alleged policy will cause MESA to cancel events or have reduced attendance at events is too attenuated to show traceability. *See Lujan*, 504 U.S. at 561-62. A plaintiff

who "is not himself the object of the governmental action or inaction he challenges" should find it "'substantially more difficult' to establish" standing, not less. *Id.* (citations omitted); *Eastern Ky. Welfare Rights Org.*, 426 U.S. at 44-45 ("indirectness of injury" generally "'make[s] it substantially more difficult'" to establish standing) (citation omitted). Given MESA's failure to establish a redressable injury in fact that is fairly traceable to the challenged putative policy, the district court erred in finding that MESA had organizational standing.

## II.     JURISDICTION WAS BARRED BY 8 U.S.C. §§1252(b)(9) AND (g).

Even if AAUP and MESA had standing, the district court lacked jurisdiction to hear their claims under §1252(b)(9) and §1252(g). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). This includes jurisdiction to review constitutional issues, which Congress can channel into other forums. *See AADC*, 525 U.S. at 490-91. So, where federal courts lack jurisdiction, they "cannot proceed at all in any cause," and instead "the only function remaining … is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 93-102 (1998). 8 U.S.C. §§

- 38 -

1252(b)(9) and (g) limit district courts' jurisdiction to hear challenges to decisions and actions to place aliens in removal proceedings, and channel review of such claims through the petition-for-review process, with ultimate review in a federal court of appeals. Because AAUP and MESA's challenge turns on potential decisions to place aliens in removal proceedings, the district court lacked jurisdiction over this case from the beginning.

While the district court pledged not to "retry immigration proceedings or judicial proceedings in another district," Dkt. #87 at 20-21, it did just that by adjudicating the propriety of those proceedings central to its decisions. The five non-party aliens were placed in removal proceedings under 8 U.S.C. §1229a, because the Government acted to revoke their visas under 8 U.S.C. §1201(i), or the Secretary of State certified them as removable under 8 U.S.C. §1227(a)(4)(C). The district court plainly would have lacked jurisdiction to hear challenges to those decisions under 1252(b)(9) and (g). *See AADC*, 525 U.S. at 945 (holding challenge to decision to commence proceedings "falls squarely within §1252(g)"); *Khalil v. President, United States*, 164 F.4th 259, 273, 265-66 (3d Cir. 2026) (holding §1252(b)(9) bars collateral challenge to removal proceedings); *see also* 8 U.S.C. § 1201(i) (barring all judicial review of visa revocations outside of removal proceedings. AAUP and MESA's attempt to

- 39 -

"lump[] together" the cases, "each of which would be jurisdictionally barred if brought alone" cannot "skirt the statutory channel markers." *Aguilar v. ICE*, 510 F.3d 1, 9-10 (1st Cir. 2007).

### A.   8 U.S.C. §1252(b)(9)

1.   Congress provided, in the Immigration and Nationality Act ("INA"), a comprehensive and exclusive remedial scheme over challenges to decisions, actions, and proceedings related to the removal of aliens, that channels all such challenges through the immigration courts and subsequent review into the courts of appeals. *See* 8 U.S.C. §§1252(a)(5), (b)(9), & (g). Section 1252(b)(9) directs that judicial review "of **all questions of law and fact** … arising from **any action taken** or proceeding brought **to remove an alien from the United States** under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. §1252(b)(9) (emphasis added).

Congress thus prescribed a single path for judicial review—"a petition for review filed with an appropriate court of appeals." §1252(a)(5). These provisions create "an unmistakable 'zipper' clause" whose "expanse is breathtaking." *Aguilar*, 510 F.3d at 9 (citation omitted). The statute, thus, deprives the

- 40 -

courts of jurisdiction except in reviewing a final order of removal. *See id.* (holding the provision is a "general jurisdictional limitation"). "Taken together, §1252(a)(5) and §1252(b)(9) means that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed only through the [petition-for-review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).

The recent decision in *Khalil* is illustrative. There, the Secretary of State issued an order under the foreign-policy provision at 8 U.S.C. §1227(a)(4)(C), and DHS charged Khalil with removability for that reason and because he made a material misrepresentation. *Khalil*, 164 F.4th at 266-67. Before the completion of removal proceedings, Khalil filed a petition for writ of habeas corpus arguing, among other things, that he was placed in proceedings in retaliation for his pro-Palestinian and anti-Israeli speech. *See id.* at 276. The Third Circuit held that, irrespective of any chill, Khalil had to wait until he files a petition for review of a final removal order to obtain judicial review of his constitutional claims. *See id.* at 273, 279. And indeed, Khalil is now pursuing just such review. *See Khalil v. Blanche*, No. 26-60344 (5th Cir.).

Neither AAUP nor MESA has shown that the Government has taken any action to remove any of their members. Those organizations nonetheless

- 41 -

seek to bring the same collateral challenge that Khalil brought and lost. It would be paradoxical to require Khalil to bring his constitutional claims in removal proceedings, while permitting someone against whom no proceedings have been brought to challenge imagined future enforcement actions based on *his* removal. And it would be doubly bizarre to allow an organization—without even a credibly threatened member—to bring such a challenge.

That is the case here. Counts I and IV of the Complaint depend on the existence of a so-called unconstitutional ideological-deportation policy. JA.333-34. In the district court's own telling, it is "a mode of enforcement policy" that consists of "detaining, deporting, and revoking noncitizens' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated." Add.191. So, like the Complaint, the district court's findings relied on determining the validity of past and future (speculative) actions taken to remove aliens from the United States.

These are precisely the types of issues that must be raised in removal proceedings. If a member of AAUP or MESA is placed in a proceeding, that person can challenge it on First Amendment grounds. *See Khalil*, 164 F.4th at 280 (noting that aliens can raise constitutional issues in immigration court and then in circuit courts); *AADC*, 525 U.S. at 496 n.2 (Ginsburg, J., concurring in

- 42 -

part and in the judgment) (describing this mechanism). But they cannot short circuit this process by bringing a preemptive and premature claim in district court before the Government acts.

2.    That AAUP's and MESA's members have not been placed in removal proceedings gives no excuse to  circumvent §1252(b)(9)'s strictures. *Cf.* Add.27-37. This Court in *Aguilar* explicitly rejected the argument that §1252(b)(9) does not apply where "the challenged actions occurred prior to the institution of any formal removal proceedings," because "[r]eading the statute" to be limited "to claims that arise from ongoing removal proceedings" would create a rush-to-the-courthouse dynamic that would unlawfully circumvent Congress's carefully reticulated review process. 510 F.3d at 10. This is what AAUP and MESA's complaint does—it supposes that the Government will take actions to place their members in removal proceedings and that they will be placed in those proceedings in violation of their constitutional rights, therefore, they will self-censor their speech out of fear. So, AAUP and MESA rushed to the courthouse and demanded the Judiciary preemptively prohibit actions the Government *might* take. Accepting this would render 1252(b)(9) a dead letter so long as aliens can imagine a hypothetical government policy that could in theory apply to them.

3.      The district court determined that "the general principals under-lying *Bantam Books*" and other similar cases (though applicable to Count II on which the court denied relief) were still informative as to its findings on Count I. *See* Add.203-04; JA.344. Yet here, too, the court should never have come that far. This attempt to transform Count I into a chilling claim does not bring the case outside of §1252(b)(9)'s strictures. AAUP and MESA claimed that the Government took illegal *actions* to institute and maintain removal proceedings, which caused AAUP and MESA's alien members to fear speak-ing out else similar *actions* be taken against them. Constitutional claim or not, it must be heard in a petition for review. 8 U.S.C. §1252(b)(9); *see also AADC*, 525 U.S. at 490-91; *Khalil*, 164 F.4th at 279-80.

4.      Likewise, attempts to skirt the jurisdictional bars by banding to-gether claims by *organizations*, not aliens, are at odds with the district court's determination that AAUP and MESA have associational standing *because of* their alien members' fears of being placed in removal proceedings. *Cf.* Add.27-37. Throughout trial, AAUP and MESA presented testimony of their mem-bers' fears of agency decisions and actions to remove them because of their constitutionally protected speech. Likewise, MESA's organizational standing was based on harm to its core activities *because of* their alien members' and

- 44 -

potential members' fears of being placed in removal proceedings. Thus, all of AAUP and MESA's claims rest on a challenge to the legality of actions taken to place aliens in removal proceedings. Grouping plaintiffs together does not avoid the strictures of (b)(9) and (g). *See Alvidres-Reyes v. Reno*, 180 F.3d 199, 205 (5th Cir. 1999) (holding that Section 1252(g) barred jurisdiction over a challenge to the INS's refusal to initiate removal proceedings against a class of individuals); *Chapinski v. Ziglar*, 278 F.3d 718, 721 (7th Cir. 2002) (same).

5. Finally, the district court's attempt to avoid the jurisdictional limitations by characterizing AAUP and MESA's claims as challenging the Government's *enforcement policy*, not individual decisions to initiate removal proceedings, also fails. Add.27, 33-34, 168-69. The language of §1252(b)(9) referring to *any action* "is keyed to the nature of the challenged agency action, not the basis for" AAUP and MESA's challenge. *M.M.V. v. Garland*, 1 F.4th 1100, 1108 (D.C. Cir. 2021). AAUP and MESA cannot plead their way out of the channeling provision by basing their challenge on a supposed *policy* to chill speech when the "nature of the challenged agency actions" are *actions* to institute removal proceedings.

Indeed, it would be especially perverse to reframe AAUP and MESA's claims as solely targeting a *policy* as opposed to a removal proceeding given

the district court's standing theory. Under *Clapper*, to support standing based on a "chilling effect" theory, the threat must be "certainly impending." 568 U.S. at 417. In other words, if AAUP and MESA have standing at all, it is because there is more than an abstract enforcement policy—there must be a concrete, "certainly impending" removal proceeding. And if there is such a proceeding, section 1252(b)(9) directs where any challenge must be heard.

### B.    8 U.S.C. §1252(g)

Section 1252(g) provides that "notwithstanding any other provision of law (statutory or nonstatutory) … no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal. Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L.*, 986 F.3d at 964. As with §1252(b)(9), this provision barred the district court's jurisdiction to hear AAUP and MESA's claims.

Section 1252(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion" and "similar discretionary decisions." *AADC*, 525 U.S. at 485 & 485 n.9. Through §1252(g) and

- 46 -

other provisions of the INA, Congress aimed to prevent removal proceedings from becoming "fragment[ed], and hence prolong[ed]." *Id.* at 487; *see Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022) (Congress' intent was to "streamline immigration proceedings by limiting judicial review to final orders, litigated in the context of petitions for review"). To achieve these ends, §1252(g) prohibits district courts from adjudicating any challenge related to the commencement of removal proceedings—not only *whether* to commence proceedings, but also *when* to commence a proceeding. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002).

In *AADC*, a group of aliens—members of the Popular Front for the Liberation of Palestine—brought a suit challenging their deportations. *Id.* at 473-75. The aliens claimed they were targeted for their beliefs and expression and even pointed to a specific statement by the "INS regional counsel" indicating as much. *Id.* at 474. They alleged that being deported "because of their affiliation with a politically unpopular group" was unlawful, in violation of the First and Fifth Amendments. *Id.* The Supreme Court held such suit jurisdictionally barred. The Court reasoned that the "decision to 'commence proceedings'" against an alien (or group of aliens) fit exactly within the plain text of

- 47 -

§1252(g)—in fact, a "challenge" to such an action was "precisely" what Congress had "in mind" when enacting that provision. *Id.* at 487. Such a challenge to one's removal (be it on constitutional grounds, or any other) must be channeled into a petition for review. *See Elgharib v. Napolitano*, 600 F.3d 597, 599, 601-03 (6th Cir. 2010) (holding 1252(g) barred constitutional claims even if another avenue of relief was unavailable); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (holding 1252(g) barred claim that alien was excluded from the United States on account of his exercise of First Amendment rights).

This case follows *a fortiori*. If aliens *themselves* cannot bring this sort of suit against the Government "for allegedly targeting them for deportation because of their affiliation with a politically unpopular group," *AADC*, 525 U.S. at 472-73, then third parties (*e.g.*, professors, AAUP, or MESA) cannot bring such a collateral suit on the ground that they wish to listen to or associate with these aliens. Otherwise, the INA's jurisdictional bars would be meaningless, circumvented in every case by a family member, colleague, or friend who wishes to readily hear from the person being deported. No court has ever indulged such a theory.

- 48 -

So as with §1252(b)(9), §1252(g) deprived the district court of jurisdiction to hear AAUP and MESA's challenge to the actions and possible actions taken to remove aliens from the United States.

### C.  None of The District Court's Reasons for Ignoring §§1252(b)(9) and (g) Has Merit

The district court did not address §1252(b)(9) in the post-trial findings and fact and conclusions of law. Instead, it attempted to distinguish §1252(b)(9) in its denial of the Government's motion to stay the Sanctions Order. *See AAUP v. Rubio*, No. CV 25-10685-WGY, 2026 WL 686418, *5-8 (D. Mass. Mar. 11, 2026). The district court argued that AAUP and MESA's alien members would be deprived of their constitutional rights if they were forced to wait until removal proceedings to vindicate them. *See id.* Meaning, the injury would be irreparable because their speech would already have been chilled. *See id.*

The Supreme Court already rejected the idea that constitutional claims are exempt from the INA's jurisdictional bars. In *AADC*, the Court indicated that whatever First Amendment rights noncitizens have could wait until their removal proceedings had been completed and the courts of appeals could review them. *See* 525 U.S. at 487-89. The concurrence agreed with the general proposition that immediate judicial consideration of selective enforcement claims is unnecessary. *See id.* (Ginsburg, J, concurring in part and concurring

- 49 -

in the judgment). Indeed, section 1252(b)(9) expressly contemplates that "[j]udicial review of all questions of law and fact, *including interpretation and application of constitutional and statutory provisions*" are "available *only* in judicial review of a final order." 8 U.S.C. §1252(b)(9). There are no exceptions at all, let alone an exception for constitutional claims asserting chilled speech.

The district court, in denying the Government's motion to dismiss, held that §1252(g) did not apply because AAUP and MESA were not bringing their claims on behalf of any aliens in removal proceedings. Rather they were challenging a claimed enforcement policy, which they believed caused harm to their members. Add.35-36. This attempt to distinguish §1252(g) fails as well. AAUP and MESA plainly brought their action on behalf of their alien-members who feared the Government's immigration enforcement actions, and the complaint seeks to bar such actions. JA.334-35. As the Supreme Court explained, §1252(g) is "clearly designed to give some measure of protection to 'no deferred action' decisions and *similar discretionary determinations.*" *AADC*, 525 U.S. at 485. This includes initiating proceedings. So AAUP and MESA bring their challenge on behalf of their members who might be placed in removal proceedings and seek to prevent that eventuality. This runs headlong

- 50 -

into §1252(g) as it preemptively challenges a discretionary prosecutorial deci-sion. Section 1252(g), like §1252(b)(9), was not designed to set up a race to the courthouse where so long as aliens file first, they can avoid 1252(g)'s strictures. *See Aguilar*, 510 F.3d at 10.

## III.    THE DISTRICT COURT ERRED IN FINDING A FIRST AMEND-MENT AND APA VIOLATION

The district court held that the purported policy violates the First Amendment and the APA because it constitutes viewpoint discrimination and chills speech. *See*, s*upra*, at 17-19. Neither theory has merit. The First Amend-ment does not prohibit the Government from removing aliens based on their political activity, as long as the Government has a facially legitimate and bona fide basis for the challenged action. And it does here. The APA claim fails for essentially the same reasons. And the district court's additional theory that the IDP constitutes an unexplained change of position is both forfeited and meritless.

### A.    The First Amendment Does Not Bar The Government From Re-moving Aliens Based On Their Political Activity

Supreme Court precedent squarely forecloses AAUP and MESA's claims that the alleged IDP violates the First Amendment. AAUP and MESA's theory is that the government has a policy of deporting aliens based

- 51 -

on their pro-Palestine political views. Even if such a policy existed, it would comport with Supreme Court precedent.

In *Harisiades v. Shaughnessy*, the Supreme Court ruled that the First Amendment was no "barrier" to the deportation of aliens based on their membership or association with the Communist Party. 342 U.S. 580, 592 (1952). Similarly, in *Turner v. Williams*, the Court held that there was no First Amendment impediment to the Government deporting an alien because of his anarchist beliefs and advocacy. *See Turner v. Williams*, 194 U.S. 279, 293 (1904); *see also Graham v. Richardson*, 403 U.S. 365, 377 (1971) ("[t]he national government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, [and the] regulation of their conduct").

The district court provided no sound basis for distinguishing *Harisiades*. The court first questioned the continuing validity of the case on the basis that it arose during the "Red Scare." Add.57. But that is not a legitimate reason for lower courts to disregard Supreme Court precedent.

The district court also disregarded *Harisiades* on the basis that aliens have the same First Amendment rights as citizens. Add.57-58. In fact, the rel-

evant cases stand only for the proposition that LPRs have *some* First Amendment rights—not that those rights are completely coterminous with citizens'. *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting the petitioner was a LPR); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that only as a noncitizen "increases his identity with our society" do the "generous and ascending scale of rights" spring into action) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 25-26, 31-32 (2010) (affirming constitutionality of speech restrictions that could include citizens where the only exemption was for "independent advocacy that might be viewed as promoting the [terrorist] group's legitimacy"); *AADC*, 525 U.S. at 488 ("an alien unlawfully in this country has no constitutional right to assert selective enforcement [based on the First Amendment]"). In fact, the relevant cases stand only for the proposition that LPRs have *some* First Amendment rights—not that those rights are coterminous with citizens.

These limits on aliens' constitutional rights are consistent with the notion that "'[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v.*

- 53 -

*Diaz*, 426 U.S. 67, 79-80 (1976) and affirming it is not dictum); *accord Trump v. Hawaii*, 585 U.S. 667, 702 (2018). This is grounded in the principle that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Kim*, 538 U.S. at 522 (cleaned up). Indeed, in the foreign relations context, the Government can burden even citizens' First Amendment rights. *See Haig v. Agee*, 453 U.S. 280, 287 (1981) (upholding executive's authority to revoke passport on national security and foreign policy grounds).

## B. The Government's Actions Were Facially Legitimate and Bona Fide

1.      To the extent that AAUP and MESA assert that the government has burdened the First Amendment rights of their *citizen* members, those claims should be reviewed under the highly deferential "facially legitimate and bona fide standard"—*i.e.*, solely whether the legal justification proffered by the agency is facially valid, without further inquiry into the justifications behind the government's actions. *See Department of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). That standard is plainly met here. Under the facially legitimate and bona fide standard, the court looks to the legal justification proffered by the agency and, if facially

- 54 -

valid, "the inquiry is at an end." *Muñoz*, 602 U.S. at 908 (reviewing a citizen's constitutional challenge to a noncitizen's visa denial for whether the agency provided a "facially legitimate and bona fide reason"). This is because Congress has plenary authority over immigration matters, which are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Mathews*, 426 U.S. at 81 n.17 (citations and quotations omitted); *see also Carlson v. Landon*, 342 U.S. 524, 534 (1952) (as long as a noncitizen "fail[s] to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders").

The Second Circuit's decision in *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), is instructive. There, the Second Circuit recognized that while noncitizens present in the United States have a constitutional right to equal protection, a claim that an executive-created registration and removal program violates equal protection based on religion, ethnicity, gender, or race, is reviewed no more stringently than under a facially legitimate and bona fide standard, or for rational basis. *Id.* at 427, 432, 438 (2d Cir. 2008) (reviewing equal protec-

tion claim challenging executive-created NSEERS program under facially legitimate and bona fide standard). The Supreme Court relied on this decision in discussing review of executive action involving aliens. *See Hawaii*, 585 U.S. at 704 (citing *Rajah*).

The Government's challenged actions in this case plainly satisfy the facially-legitimate-and-bona-fide standard. The Secretary of State determined that Khalil, Mahdawi, Chung, and Suri were removable under 8 U.S.C. §1227(a)(4)(C), because they "would have potentially serious adverse foreign policy consequences and compromise a compelling U.S. foreign policy interest." JA.1564, 1572, 1589, 1592. This was based on their participation in antisemitic protests and disruptive activities which created a hostile environment for Jewish students, engaging in threatening rhetoric and intimidation of pro-Israel bystanders, and support for designated terrorist organizations, among other reasons. *See supra* pp.9-10. Öztürk, meanwhile, had her visa revoked as a matter of discretion under 8 U.S.C. §1201(i) based on the Secretary of State's finding that she "had been involved in associations that may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." *See*, *supra*, p.10. These

were facially legitimate and bona fide justifications for the enforcement actions against these individuals, supported by statute, and based on the aliens' conduct the district court's inquiry should have ended there. *Kleindienst*, 408 U.S. at 754, 769-70; *see Muñoz*, 602 U.S. at 908.

Although the district court purported to apply the facially-legitimate-and-bone-fide standard, it in fact proceeded to look behind the individual removal decisions. *See* Add.198-99. Despite AAUP and MESA's allegation of "an ideological deportation policy" targeting pro-Palestinian speech, the district court concluded that "[t]here was no ideological deportation policy." *See* Add.163. Indeed, the only way the district court was able to mount any assertion that the Government was attempting to chill speech was by looking to statements made by executive branch officials as evidence of an ulterior motive. *See* Add.198-99. This is precisely the action that the Supreme Court admonished against when applying the facially legitimate and bona fide standard. *See Kleindienst*, 408 U.S. at 758, 766) (declining to balance the First Amendment interests of those bringing the suit against Congress's plenary power because Congress had placed that responsibility "in the hands of the executive"). The same should apply here where Congress placed plenary power in the hands of the executive in 8 U.S.C. §§1201(i) & 1227(a)(4)(C). The

- 57 -

district court should have followed *Kleindienst* and deferred to the agency's facially legitimate and bona fide reasons for placing aliens in removal proceedings. *See* JA.1564-65, 1572-73, 1582, 1589-90, 1592-93.

### C.    The District Court Erred in Finding an APA Violation

The district court's APA holding rested not only on its erroneous finding of a constitutional violation, but also on a determination that the Government changed prior policy without reasonable explanation. The district court contended that the Government had reversed the September 3, 2021, Memorandum by Secretary of Homeland Security Mayorkas. www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf; Add.81-82, 210-211. That argument, like AAUP and MESA's constitutional claim, lacks merit. The first time this memorandum was raised was in AAUP and MESA's post-trial brief. Dkt# 254 at 6, 137. So, the Government did not have an opportunity to present evidence on or rebut AAUP and MESA's interpretation of the memorandum as there were no replies to the post-trial briefs. If it had, at the very least the Government would have pointed out that although the Mayorkas Memo instructs that "[a] noncitizen's exercise of their First Amendment rights … should never be a factor in deciding to take enforcement action," Add.81,

Mayorkas Memo at 4, it caveats this instruction with the following: "This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit." Mayorkas Memo at 4. In any event, that claim, too, fails because it hinges on a non-existent First Amendment violation.

## IV.    The District Court Erred in Entering its Sanction Remedy

The district court's Sanctions Order violates fundamental limitations on its jurisdiction by creating a newly minted cause of action for AAUP and MESA's members who experience "an adverse immigration action." It provides that (1) "[u]pon commencement" of such action, "the Sanction Plaintiff's removal from the United States is automatically **STAYED** during the pendency of the Sanction Action"; and (2) in such action, the adverse immigration action is automatically "void[ed]," unless the government can rebut the presumption that the action was in retaliation for First Amendment conduct. AAUP and MESA did not request this remedy, have not defended it, and this Court has stayed it pending appeal.

1.    Because §1252(b)(9) and (g) deprive the district court of jurisdiction over the action in toto, it necessarily had no jurisdiction to enter *any* relief. Also, the Sanctions Order conflicts with the commands of §§1252(b)(9) and (g)

limiting challenges to actions to bring proceedings to judicial review of removal orders by setting up novel parallel proceedings in other district courts. *See AADC*, 525 U.S. at 487 ("challenge to the Attorney General's decision to 'commence proceedings' … falls squarely within §1252(g)"); *Aguilar*, 510 F.3d at 9-14 (noting the "breathtaking scope" of §1252(b)(9)).

2.      Even absent those bars, §1252(f)(1) deprives the district court of jurisdiction to create its novel judicial procedure. It provides: "[N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter" as to non-named parties. 8 U.S.C. §1252(f)(1); *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022); ("[§1252(f)(1)] generally prohibits … injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the … provisions").

The district court's order unquestionably enjoins or restrains the operation of covered provisions found in Part IV of the statute. It restrains removal proceedings under 8 U.S.C. §1229a and detention of aliens under 8 U.S.C. §1231. And, notwithstanding the district court's characterization of the order as a "sanction," it is "properly characterized as an 'injunction'" as "it substantially and obviously alters the parties' pre-existing legal relationship." *See*

- 60 -

*Jones-El v. Berge*, 374 F.3d 541 (7th Cir. 2004). It does so by placing burdens on the Government vis-à-vis the "Sanction Action" and "Sanction Plaintiffs" that otherwise do not exist. The Court's order also puts the "burden" on the Government to "affirmatively ascertain and determine whether [a qualified "Sanction Plaintiff"] has filed a Sanction Action in the United States District Courts." Add.247. The order then requires the Government to prove by clear and convincing evidence that it has an "appropriate" basis to remove a "Sanction Plaintiff." *Id.* Lastly, "[u]pon the moment of commencement of any Sanction Action … the Sanction Plaintiff's removal from the United States is automatically [stayed] during the pendency of the Sanction Action." *Id.* at 3. Because the Court's "Sanction" is clearly injunctive in nature, it is barred by §1252(f)(1).

The most egregious example of judicial overreach is the district court's prohibition on removing an alien because of the conviction of a crime before September 30, 2025. *See* Add.235 & n.5. This effectively nullifies a broad swath of the INA where Congress requires aliens who committed or were convicted of certain crimes to be removed. *See, e.g.*, 8 U.S.C. §§1182(a)(2), 1227(a)(2).

Section 1252(f)(1), thus, bars the Sanctions Action and §1252(f)(1), in combination with §1252(b)(9) and (g) would bar most of the other relief AAUP and MESA sought below.

3.      The Sanction Order also violates Rule 65, which provides that an injunction "binds only" "the parties" "who receive *actual notice* of it by personal service or otherwise." Fed. R. Civ. P. 65(d)(2) (emphasis added). It provides for a prospective and "automatic[] **STAY**[]" of any removal proceedings upon "commencement" of an action by a "Sanction Plaintiff" and places "the burden" on the United States "affirmatively to ascertain and determine whether such person has filed a Sanction Action in the United States District Courts." Add.235-36. That burden-flipping mandate cannot be squared with Rule 65(d)(2), not to mention basic principles of fairness, particularly because the Sanctions Order purports to impose binding obligations on federal officials in the absence of notice to such effect.

The Sanction Order purports not to control proceedings in *other district courts* over which it has no power, and over which the district court conceded it has no jurisdiction. Add.236., But it plainly operates to direct how proceedings in other district courts should proceed. That is far outside the district court's authority. *See Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415,

430 n.10 (1996) ("If there is a federal district court standard, it must come from the Court of Appeals, not from … district court judges.").

The Sanction Order exceeds the scope of the district court's equitable authority. A stay is an "equitable remedy." *See Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay); *DHS v. D.V.D.*, 145 S. Ct. 2153, 2158 (2025) (Sotomayor, J., dissenting). Thus, the "substantive prerequisites for obtaining" a stay "depend on traditional principles of equity jurisdiction." *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 318-19 (1999); *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). And "the traditional stay factors contemplate individualized judgments in each case," where "[t]he party requesting [the] stay bears the burden." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (citation omitted). The two "most critical" factors are "whether the stay applicant has made a strong showing that he is likely to succeed on the merits," and "whether the applicant will be irreparably injured absent a stay." *Id.* at 434.

The Sanction Order transgresses these principles. It purports to "automatically **STAY**[]" the removal of a given alien upon filing and places the burden on the *non-moving* party to remove the stay. *But see Nken*, 556 U.S. at 434. It grants a stay without a meaningful showing that the applicant has *any*

likelihood of success on the merits. And it does so when the only harm proven is removal, even though the Supreme Court has made clear that removal "is not categorically irreparable." *Id.* at 435. This chutes-and-ladders system of relief is irreconcilable with traditional equity.

There is a word for what the district court did here: legislation. Creating federal causes of action—including for constitutional violations—is for Congress, not the courts: "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). This is true "[i]n both statutory and constitutional cases." *Hernandez v. Mesa*, 593 U.S. 93, 101 (2020).

At bottom, the Sanction order invades the province of Congress, which did not authorize the new "Sanction Action." The Supreme Court has rejected such free-floating power of federal courts to "adjust their remedies so as to grant the necessary relief when federally protected rights have been invaded." *Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017) (quoting *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 392 (1971)); *see also Hernandez*, 593 U.S. at 99-101 (same). The presumption of unconstitutionality also amounts to a preclearance regime for removal proceedings contrary to §§1252(b)(9), (g), and (f)(1). And to make matters worse, the order upends the presumption of

*regularity* that generally attaches to official acts. *See Nieves v. Bartlett*, 587 U.S. 391, 399-400 (2019) (explaining that when presumption of regularity is suspended, the plaintiff has the burden to prove lack of probable cause).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court and direct that the case be dismissed for lack of jurisdiction. Alternatively, the Court should reverse the district court's judgment on the merits. At a minimum, the Court should vacate the Sanction portion of the district court's remedy order.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
  *Civil Division, U.S. Department of Justice*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*

 /s/ Paul F. Stone
PAUL F. STONE
  *Acting Chief*
LINDSAY M. MURPHY
  *Deputy Chief*
VICTORIA SANTORA
  *Senior Counsel for National Security*
JESSE BUSEN
  *Counsel for National Security*
  *National Security Unit*

- 65 -

*Office of Immigration Litigation*
*Civil Division, U.S. Department of Justice*
*Post Office Box 878, Ben Franklin Station*
*Washington, D.C.  20044*
*Telephone: (202) 305-9647*
*Facsimile: (202) 307-8698*

JUNE 17, 2026                    ATTORNEYS FOR DEFENDANTS-APPELLANTS

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that this Brief for Defendants – Appellants complies with the word limit of Rule 31(a)(7)(B)(i), of the Federal Rules of Appellate Procedure, because, excluding the parts of the documents exempted by Rule 32(f), the brief contains 12,884 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it is prepared in a proportionally spaced typeface using MS Word in 14-point Century Expanded BT.

/s/ Paul F. Stone
PAUL F. STONE
*United States Department of Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2026, I electronically filed the foregoing Principal Brief with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ Paul F. Stone

PAUL F. STONE
*United States Department of Justice*